ASHALL HOMES LIMITED, Arthur Simon Davies, Scott Alexander Ashall, David William Ashall, Anthony Mark Ashall and Thames Limited, Plaintiffs,

v.

ROK ENTERTAINMENT GROUP INC., a Delaware corporation, Jonathan Kendrick, Laurence Alexander and Alex Renny, Defendants.

C.A. No. 4643–VCS.

Court of Chancery of Delaware.

Submitted: Jan. 26, 2010.
Decided: April 23, 2010.

Charles J. Brown, III, Esquire, Archer & Greiner, Wilmington, Delaware; Mitchell D. Cohen, Esquire, Vedder Price P.C., New York, New York, Attorneys for Plaintiffs Ashall Homes Limited, Arthur Simon Davies, Scott Alexander Ashall, David William Ashall, Anthony Mark Ashall, and Thames Limited.

Daniel B. Rath, Esquire and Rebecca L. Butcher, Esquire, Landis, Rath & Cobb, LLP, Wilmington, Delaware; Kirk L. Brett, Esquire, Duval & Stachenfeld, LLP, New York, New York, Attorneys for De-fendants ROK Entertainment Group Inc., Jonathan Kendrick, and Alex Renny.

## OPINION

STRINE, Vice Chancellor.

### I. Introduction

This dispute is between a corporation and its stockholders over whether the stockholders were tricked into making their investments in the company. The stockholders allege that the corporation's officers promised that, in return for investing in the company, the investors would ultimately receive shares of stock in a successor U.S. company that would be SEC-registered, unrestricted, and freely-tradable. That promise was allegedly broken when the stockholders were issued unregistered and restricted shares after executing the necessary investment agreements. Although the corporation and its officers dispute the merits of the stockholders' claims, they primarily point to forum selection provisions in the investment agreements, which choose the courts of England to adjudicate disputes between the parties, and argue that this court is precluded from exercising jurisdiction over the stockholders' claims. That is, the defendants raise the threshold question of whether this court is the proper venue to adjudicate this dispute.

After analyzing the agreements, my conclusion is that this court cannot exercise jurisdiction over the stockholders' claims without dishonoring the parties' contracts. Both of the investment agreements contain unequivocal language mandating exclusive jurisdiction in the courts of England. Under well-settled precedent, this court must honor such clear contractual expressions of intent to select a particular forum.[1]

1. *Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del.Ch. Mar.26, 2007); *see also Prestancia*, 2005 WL 1364616, at *7 (Del.Ch. May 27, 2005) (quoting DONALD J. WOLFE, JR. MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN

Therefore, I conclude that this matter should be dismissed pursuant to Rule 12(b)(3).

## II. *Factual Background*

These are the facts as drawn from the complaint and the documents it incorporates.

### A. *The Parties And The Structure Of The Investment*

In October 2007, defendants Jonathan Kendrick and Laurence Alexander,[2] officers and directors of a United Kingdom entity called ROK Entertainment Group Ltd. ("ROK U.K. Group"), solicited plaintiffs Ashall Homes Limited, Arthur Davies, Scott Ashall, ·David Ashall, Anthony Ashall, and Thames Limited (collectively, the "Ashall Plaintiffs") to invest in ROK U.K. Group.[3] The proposed investment in ROK U.K. Group would be the first step in a three-part deal, where ROK U.K. Group would become a wholly-owned subsidiary of Cyberfund, Inc. ("Cyberfund"), an Oklahoma corporation, through a stock-for-stock exchange, and then Cyberfund would reincorporate in Delaware as ROK Entertainment Group, Inc. ("ROK Delaware").[4] That is, the Ashall Plaintiffs allege that Kendrick and Alexander told them that, if they invested in ROK U.K. Group, their ROK U.K. Group shares would be converted to Cyberfund shares and ultimately to ROK Delaware shares.[5] Kendrick and Alexander also allegedly told the Ashall Plaintiffs that "in exchange for their investment, within fourteen days of receipt of the investment funds, they would receive 'unrestricted,' 'free-to-trade' share certificates in Cyberfund that could be immediately traded."[6] In particular, on October 16, 2007, Kendrick allegedly confirmed to the Ashall Plaintiffs that, if they invested in ROK U.K. Group, Cyberfund would issue a registration statement for their Cyberfund shares that would make the shares unrestricted after the stock-for-stock exchange was accomplished.[7] Later that same month, Alexander allegedly told Thames Limited that it would receive unrestricted shares in exchange for its investment in ROK U.K. Group.[8]

Based on these representations, Ashall Homes Limited, Arthur Davies, Scott Ashall, David Ashall, and Anthony Ashall signed identical subscription agreements (the "Subscription Agreements") and collectively invested approximately $500,000 in ROK U.K. Group on November 8, 2007.[9] On the same day, Thames Limited invested $1,000,000 in ROK U.K. Group.[10] At the same time, each Ashall Plaintiff except Thames Limited executed identical share sale agreements (the "Share Sale Agreements") agreeing to swap their shares in ROK U.K. Group for shares in Cyber-

---

THE DELAWARE COURT OF CHANCERY 5–4[a], at 5–53 to 5–54 (2005)).

2. Recently, all claims against Alexander were voluntarily dismissed. *See* Stipulation of Dismissal Without Prejudice (Jan. 19, 2010).

3. Compl. ¶ 22.

4. Therefore, all of the parties, with the exception of Cyberfund, ROK Delaware, and Thames Limited, which is incorporated and has a business address in Mauritius, reside in the United Kingdom. *Id.* at ¶¶ 3–14.

5. *Id.* at ¶¶ 22–25.

6. *Id.* at ¶ 23.

7. *Id.*

8. *Id.*

9. *Id.* at ¶ 26.

10. *Id.* at ¶ 29.

fund.[11] Thames Limited executed a Share Sale Agreement in February 2008.[12]

When the reincorporation of Cyberfund as the Delaware entity ROK Delaware was accomplished, Kendrick became ROK Delaware's Chairman, Alexander was named President and CEO, and Alex Renny was named Chief Financial Officer, Secretary, and Treasurer (as well as a director).[13]

## B. *The Subscription Agreements And The Share Sale Agreements*

Two sets of agreements were required to effect the transformation of ROK U.K. Group shares into ROK Delaware shares. Under the Subscription Agreements, the Ashall Plaintiffs agreed to purchase shares in ROK U.K. Group. Then, under the Share Sale Agreements, the Ashall Plaintiffs agreed to sell and transfer their shares in ROK U.K. Group to Cyberfund. Therefore, these two agreements accomplished the first and second steps in the three-step transformation of ROK U.K. Group into ROK Delaware. The agreements were executed simultaneously.[14]

Both the Subscription Agreements and the Share Sale Agreements contain forum selection provisions (the "Forum Selection Provisions") that vest jurisdiction in the English courts and choice of law clauses that require the agreements to be governed by and interpreted under English law. The relevant provision in the Subscription Agreements provides: "This Agreement shall be construed and interpreted in accordance with the laws of Eng-land and the English courts shall have jurisdiction over any disputes arising hereunder." [15] And, the Share Sale Agreements provide: "This Agreement shall be governed and interpreted in accordance with English law and the parties submit to the exclusive jurisdiction of the English courts." [16]

In relevant part, the Share Sale Agreements also plainly provide that Cyberfund would issue shares to the Ashall Plaintiffs that were both restricted and unregistered: "The Shareholder acknowledges and agrees that the Cyberfund Shares issued to the Shareholder on Closing shall be subject to restrictions on their sale or transfer in accordance with United States law and that such Cyberfund Shares shall, unless otherwise agreed, be issued on an unregistered basis." [17] Notably, that language expressly contradicts the alleged earlier oral promises from Kendrick and Alexander that the shares would be registered and unrestricted. The Share Sale Agreements also state that "[i]f Closing has not taken place by 31 December 2007, then this Agreement shall be of no further force and effect and shall be automatically terminated." [18] "Closing" is defined in the Share Sale Agreements as "when the Company shall validly allot and issue to the Shareholder the . . . Cyberfund Shares." [19] Also, the Share Sale Agreements did not include an integration clause, although the Subscription Agreements contained such a provision, stating that "[t]his Agreement sets forth the en-

11. *Id.* at ¶ 28.

12. *Id.* at ¶ 31; Def.'s Reply Br. 8.

13. Compl. ¶ 37.

14. *Compare* Def.'s Op. Br. Ex. A (Share Sale Agreement (Nov. 9, 2007)) (the "Share Sale Agreements") *with* Def.'s Op. Br. Ex. B. (Subscription Agreement (Nov. 8, 2007)) (the "Subscription Agreements").

15. Subscription Agreements § 4(c).

16. Share Sale Agreements § 8.

17. *Id.* at § 6.2.

18. *Id.* at § 4.2.

19. *Id.* at § 4.1.

tire Agreement and understanding between the Parties and *supersedes all oral and written understandings, representations and discussions between them respecting its subject matter.*"[20] Finally, the Share Sale Agreements provide that "[n]o term of this Agreement is enforceable under the Contracts (Rights of Third Parties) Act of 1999 by a person who is not a party to this Agreement."[21]

## C. *The Stock Certificates*

As planned, after the Ashall Plaintiffs invested in ROK U.K. Group, they received stock certificates for their respective shares.[22] And, following the stock-for-stock exchange, the Ashall Plaintiff's ROK U.K. Group shares were converted to Cyberfund shares in turn.[23] But, because of the impending reincorporation of Cyberfund as ROK Delaware, Cyberfund gave the Ashall Plaintiffs written notice on December 19, 2007 (the "December Notice") that it would not issue stock certificates to the Ashall Plaintiffs until that reincorporation was accomplished.[24] The letter indicated that the brief delay—reincorporation was "scheduled to occur at the end of December 2007"—was simply to avoid issuing stock certificates in Cyberfund's name and then having to re-issue certificates in ROK Delaware's name shortly thereafter.[25] In February 2008, after that reincorporation was completed, ROK Delaware issued the Ashall Plaintiffs stock certificates that reflected the shares issued to them in exchange for their ROK U.K. Group shares in the exchange with Cyberfund.[26] The ROK Delaware stock certificates stated that the Ashall Plaintiffs' shares were restricted.[27]

Upon receiving the ROK Delaware shares, the Ashall Plaintiffs returned them because they were restricted and repeatedly requested that ROK Delaware issue unrestricted shares.[28] Allegedly, ROK Delaware repeatedly assured the Ashall Plaintiffs through April and May 2008 that unrestricted shares would eventually be issued.[29] On June 6, 2009, the Ashall Plaintiffs filed their complaint alleging that the defendants fraudulently induced the Ashall Plaintiffs to invest in ROK U.K. Group (Counts I and II); that ROK Delaware, as the legal successor to ROK U.K. Group and Cyberfund, breached its contract with the Ashall Plaintiffs to sell unrestricted stock (Counts III and IX); that the defendants committed deceit, negligently misrepresented, or tortiously interfered with business relations by making false statements to the Ashall Plaintiffs (Counts IV through VIII); that ROK Delaware wrongfully converted the money the Ashall Plaintiffs invested in ROK U.K.

**20.** Subscription Agreements § 4(b) (emphasis added).

**21.** Share Sale Agreements § 7.

**22.** Compl. ¶ 27.

**23.** *Id.* at ¶ 33.

**24.** In a letter dated December 19, 2007, the stockholders were informed that no Cyberfund shares would be issued because those shares "would need to be returned and then re-issued when the company becomes ROK Entertainment Group Inc. At that stage, any documentation bearing the Cyberfund name would become invalid. It would mean the return of the Cyberfund share certificates and issuing of the new ROK Entertainment Group Inc. share certificates. Consequently, we think it is prudent and efficient that issuance occurs on completion of the name change." Compl. Ex. D (the "December 19 Notice").

**25.** *Id.*

**26.** *Id.* at ¶ 39.

**27.** *Id.*

**28.** *Id.* at ¶¶ 40, 42, 46.

**29.** *Id.* at ¶¶ 42, 45–48.

Group (Count X); and that the Ashall Plaintiffs are entitled to rescission of the Subscription Agreements (Count XI). The central theme to the Ashall Plaintiffs' arguments on all of these counts is that the defendants' oral promises to issue unrestricted, registered shares overrode the express language in the Share Sale Agreements indicating that the shares to be issued would be restricted and unregistered.[30]

## III. *Analysis*

■ The defendants move to dismiss the Ashall Plaintiffs' complaint under both Rule 12(b)(3) and Rule 12(b)(6). Because dismissal is mandated under Rule 12(b)(3), I do not reach the Rule 12(b)(6) argument.

### A. *Legal Standard*

■ The courts of Delaware defer to forum selection clauses and routinely "give effect to the terms of private agreements to resolve disputes in a designated judicial forum out of respect for the parties' contractual designation."[31] Under Court of Chancery Rule 12(b)(3), a court will grant a motion to dismiss based upon a forum selection clause where the parties "use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action."[32] Forum selection clauses can be applied not only to contract-based claims but also tort claims arising out of, or depending upon, the contractual relationship in question.[33]

■ When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract.[34] Here, the agreements clearly chose English law to govern the parties' relationship,[35] and it appears that most of the relevant conduct occurred in England, and that none of the conduct on which the

30. Pl.'s Ans. Br. 13–18.

31. *Troy*, 2007 WL 949441, at *2; *see also Prestancia*, 2005 WL 1364616, at *7 (quoting WOLFE PITTENGER 5–4[a], at 5–53 to 5–54).

32. *Eisenbud v. Omnitech Corp. Solutions, Inc.*, 1996 WL 162245, at *1 (Del.Ch. Mar. 21, 1996).

33. *See Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir.1993) (Regardless of the duty sought to be enforced in a particular cause of action, if the duty arises from the contract, the forum selection clause governs the action.); *Lambert v. Kysar*, 983 F.2d 1110, 1121 (1st Cir.1993) (rejecting the argument that a forum selection clause did not apply to tort claims and stating that [w]e cannot accept the invitation to reward attempts to evade enforcement of forum selection agreements through artful pleading of [tort] claims' in the context of a contract dispute); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d Cir.1983) ("We agree with those courts which have held that where the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain." (citations omitted)), *overruled on other grounds* 490 U.S. 495, 109 S.Ct. 1976, 104 L.Ed.2d 548 (1989); *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *5 n. 18 (Del.Ch. Oct. 19, 2000) (citing cases holding that a forum selection clause will not be defeated by recasting contract claims as tort claims for the proposition that "artful pleading" designed to circumvent enforcement of the parties' contractual choice of forum is inappropriate); *Loveman v. Nusmile, Inc.*, 2009 WL 847655, at *4 (Del.Super. Mar. 31, 2009) ("Authority from this and other jurisdictions provides that 'where the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain.' " (citations omitted)).

34. *See Del Pharm., Inc. v. Access Pharm., Inc.*, 2004 WL 1631355, at *1 (Del.Ch. Jul. 16, 2004); *see also Fitzgerald v. Cantor*, 1998 WL 842304, at *1–2 (Del.Ch. Nov. 5, 1998).

35. *See supra* page 1243.

Ashall Plaintiffs' claims turn occurred in Delaware. It is telling, however, that neither party has cited to English law—the law for which they bargained—in its briefing on this motion to any material degree. That illustrates a basic problem with adjudicating this dispute in Delaware: this court does not have—and cannot pretend to have—the same knowledge of English law or even access to English sources as the courts of England. In deference to the English courts, for which this court has great respect, and because the parties have not cited to English law to an appreciable extent,[36] the analysis will proceed exclusively under Delaware law.

### B. *The Parties Agreed To Submit This Dispute To The Exclusive Jurisdiction Of The English Courts*

The issue is whether the Forum Selection Provisions in the Subscription Agreements and the Share Sale Agreements preclude this court from exercising jurisdiction over the Ashall Plaintiffs' claims. The defendants argue that those Forum Selection Provisions clearly require the Ashall Plaintiffs to bring their claims in the courts of England. In response, the Ashall Plaintiffs make four arguments for why the Forum Selection Provisions are inoperative: first, they argue that the Share Sale Agreements terminated on December 31, 2007 because closing had not

yet occurred; second, they argue that the defendants do not have standing to enforce the provisions of the Share Sale Agreements; third, they argue that the Forum Selection Provision in the Subscription Agreements does not exclusively choose English courts; and fourth, they argue that, even if the Subscription Agreements' Forum Selection Provisions do exclusively choose the courts of England, the Forum Selection Provisions do not encompass their claims.

I analyze these arguments below. Because some of the Ashall Plaintiffs' arguments apply to one agreement but not the other, I consider the enforceability of each agreement's Forum Selection Provision separately. But, the conclusion as to both agreements is the same: each agreement mandates exclusive jurisdiction in the English courts.

### 1. *The Share Sale Agreements Mandate Exclusive Jurisdiction In The English Courts*

▮▮ The language of the Share Sale Agreements clearly provides for the courts of England to have exclusive jurisdiction. The Share Sale Agreements' Forum Selection Provision reads as follows: "This Agreement shall be governed and interpreted in accordance with English law and the parties submit to the *exclusive* juris-

---

**36.** On the question of whether the Forum Selection Provisions preclude this court from exercising jurisdiction over the dispute, the Ashall Plaintiffs' briefing cited only one English case, and the defendants' briefs relied entirely on the U.S. Supreme Court's recitation of English law in its decades-old decision in *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). *See* Pl.'s Ans. Br. 4–13; Def.'s Op. Br. 6–9; Def.'s Rep. Br. 3–18. Apparently, the parties are in agreement that there is no material difference between English and Delaware law in regard to the enforceability of forum selection clauses. *See* Pl.'s Ans. Br. 5 n. 1 ("With

regard to the ROK Defendants' argument regarding the applicability of the forum selection clauses in the Subscription Agreements and the Share Sale Agreements, the ROK Defendants admit that there is no substantial difference between Delaware law and English law. Therefore, a choice of law analysis is unnecessary, and Plaintiffs will hereafter cite to both Delaware and English case law where appropriate.") (citation omitted). Candidly, I am not sure that the parties' lawyers know enough about English law on the subject to know whether that is indeed the case. But I assume that they are correct.

diction of the English courts." [37] It is hard to imagine a clearer indication that the English courts are to have exclusive jurisdiction over disputes arising from the agreement.

Nevertheless, the Ashall Plaintiffs make a number of arguments, why the Forum Selection Provision in the Share Sale Agreements does not apply. First, the Ashall Plaintiffs argue that the Forum Selection Provision in the Share Sale Agreements cannot be enforced because the Share Sale Agreements terminated on December 31, 2007. As noted above, the Share Sale Agreements provided that the Agreements would terminate on December 31, 2007 unless the stockholders were allotted and issued the Cyberfund shares. [38] Because the Cyberfund shares were not issued until February 2008, the Ashall Plaintiffs argue that the Share Sale Agreements terminated by their terms, and therefore the Forum Selection Provision is unenforceable. In response, the defendants argue that the Ashall Plaintiffs waived their right to enforce the Share Sale Agreements' termination provision, and therefore the Forum Selection Provision in those agreements still has force.

■ The Ashall Plaintiffs' argument must be rejected because interpretation of the Share Sale Agreements' termination provision and application of the doctrine of contractual waiver are issues for the court identified in the Forum Selection Provisions to decide. Given the evidence in the record, it is easy to see how an English court might decide that the Ashall Plaintiffs waived their rights to enforce the termination provision. For example, under Delaware law, a waiver is found where a party had actual or constructive notice of a known right, [39] and that the party "voluntarily and intentionally relinquished [that] known right." [40] The policy underlying the rule is that a "party cannot both accept the benefits which accrue under a contract on the one hand and shirk its disadvantages on the other." [41] Before the termination date, the Ashall Plaintiffs received the December Notice indicating that, for simple efficiency reasons, the stock certificates would not be delivered until after Cyberfund reincorporated as ROK Delaware, which was scheduled to occur shortly thereafter. [42] Therefore, the Ashall Plaintiffs had express notice that Cyberfund intended to postpone the issuance of the stock certificates past the contractual ter-

**37.** Share Sale Agreement § 8 (emphasis added).

**38.** *See supra* page 1243.

**39.** *See Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 456 (Del.1982) ("Waiver is the voluntary and intentional relinquishment of a known right. It implies knowledge of all material facts, and intent to waive.") (internal citations omitted); *Julian v. E. States Constr. Serv.*, 2009 WL 1211642, at *8 (Del.Ch. May 5, 2009) ("To establish waiver, one must show that the other 'party voluntarily and intentionally relinquished a known right.' The asserting party must prove that the waiving party had actual or constructive notice of this known right.") (internal citations omitted); *Pers. Decisions, Inc. v. Bus. Planning Sys., Inc.*, 2008 WL 1932404, at *7

n. 40 (Del.Ch. May 5, 2008) (citing 13 WILLISTON ON CONTRACTS § 39:34 (4th ed.2000)) (noting that constructive knowledge is sufficient to effect a waiver).

**40.** *Danvir Corp. v. City of Wilmington*, 2008 WL 4560903, at *7 (Del.Ch. Oct. 6, 2008).

**41.** *Cianci v. JEM Enter., Inc.*, 2000 WL 1234647, at *12 (Del.Ch. Aug. 22, 2000).

**42.** *See* Compl. Ex. D. (explaining that, if certificates were issued under the Cyberfund name, that documentation would be invalid after Cyberfund changed its name to ROK Delaware; therefore, as a matter of practicality, certificates would be delivered after the reincorporation and name change was completed).

mination deadline. But, upon receiving the December Notice, the Ashall Plaintiffs apparently never protested the delayed delivery of the stock certificates. Indeed, when they received the certificates in February 2008, they returned them to ROK Delaware because they were restricted shares, not because they came a month late.[43] And, the Ashall Plaintiffs repeatedly contacted ROK Delaware over the next several months requesting reissued shares, indicating that they still sought the benefits of the contract.[44] Furthermore, Thames Limited executed a Share Sale Agreement in February 2008,[45] over a month *after* the Share Sale Agreements purportedly terminated. Therefore, based on this evidence, the court selected by the parties to adjudicate disputes under the Share Sale Agreements might reasonably conclude that, because the Ashall Plaintiffs received explicit notice of the delay and therefore knew that the certificates would only be delivered after the reincorporation occurred, their (1) failure to object to the timing of delivery of the certificates, and (2) repeated attempts to reap the benefits of the contract constituted a voluntary and intentional waiver of any right to allege the termination of the Share Sale Agreements.[46]

But, at this stage in the analysis—where this court is to decide whether it can exercise jurisdiction over a dispute, and not to decide the outcome of the dispute itself— coming to a conclusion as to whether the Share Sale Agreements' termination provision was waived would be inappropriate. To do so might allow a party to circumvent duties for which the other party bargained. Deciding, for example, that the Ashall Plaintiffs did not waive their rights, and that the termination provision therefore applies, would allow the Ashall Plaintiffs to make an end-run around an otherwise enforceable Forum Selection Provision through an argument about the enforceability of other terms in the contract. Such an end-run has been denied in the analogous situation of enforcement of arbitration provisions, where courts have held that a claim that a contract was fraudulently induced is for the arbitrator, not a court, to decide.[47] Here, I cannot decide whether the termination provision applies without usurping the role of the English courts, which were expressly charged with adjudicating disputes over the Share Sale Agreements.

■ The Ashall Plaintiffs' second argument for why the Forum Selection Provision in the Share Sale Agreements does not apply is that the defendants do not have standing to enforce the terms of the Share Sale Agreements. As noted above, the Share Sale Agreements provide that "[n]o term of this Agreement is enforceable ... by a person who is not a party to

---

43. The Ashall Plaintiffs returned the certificates on February 18, 2008, but their complaint only states that they returned the certificates because the shares were restricted. *See* Compl. ¶¶ 40, 42. There is no mention in their complaint or their briefing that the Ashall Plaintiffs objected to the certificates because the delayed issuance terminated the Share Sale Agreements.

44. *See supra* page 1244.

45. *See supra* page 1243.

46. *See Julian,* 2009 WL 1211642, at *10 (determining that defendant waived his right to challenge application of an amendment to a stockholder agreement because the defendant had knowledge of the amendment and failed to object to its application at the time).

47. *See, e.g., Karish v. SI Intern., Inc.,* 2002 WL 1402303, at *4 (Del.Ch. June 24, 2002) (A claim of fraud in the inducement of the contract generally as opposed to the arbitration clause itself is for the arbitrators and not for the courts. (quoting *Prima Paint Corp. v. Flood Conklin Mfg. Co.,* 388 U.S. 395, 400, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967))).

this Agreement." [48] The Ashall Plaintiffs argue that that provision precludes the defendants from enforcing the Share Sale Agreements because they were not signatories to the Agreements, which were executed by Cyberfund. But, the Ashall Plaintiffs' reliance on that provision overlooks their own allegation that "ROK is the *legal successor* by merger to Cyberfund." [49] Indeed, the Share Sale Agreements provide that they "shall be binding on and shall survive for the benefit of the successors in title and permitted assigns of the Parties." [50] Therefore, the Share Sale Agreements expressly permit defendant ROK Delaware, as Cyberfund's successor, to invoke the Forum Selection Provision. Furthermore, defendants Kendrick and Renny, officers and directors of ROK U.K. Group, Cyberfund, and ROK Delaware, have standing to invoke the Forum Selection Provision as parties "closely related to one of the signatories such that the nonparty's enforcement of the clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound." [51] Because Kendrick and Renny solicited the Ashall Plaintiffs to participate in the investment, because Kendrick and Renny managed the Cyberfund acquisition and the reincorporation of ROK Delaware, and because they are being sued by the Ashall Plaintiffs as a result of acts that the Ashall Plaintiffs themselves contend directly implicate the negotiation of and performance under the Share Sale Agreements, it was foreseeable that the defendants would invoke the Forum Selection Provision of the Share Sale Agreements, and it would be inequitable to permit the Ashall Plaintiffs to escape their contractual promise to litigate all disputes arising under the Share Sale Agreements in England.

### 2. The Subscription Agreements Also Mandate Exclusive Jurisdiction In The English Courts

 The language of the Forum Selection Provision in the Subscription

---

48. *See supra* page 1244.

49. Compl. ¶ 10 (emphasis added).

50. Share Sale Agreements § 6.3.

51. *BNY AIS Nominees Ltd. v. Quan*, 609 F.Supp.2d 269, 275 (D.Conn.2009) (quoting *Morag v. Quark Expeditions, Inc.*, 2008 WL 3166066, at *5 (D.Conn. Aug. 5, 2008); *see also Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir.2007) (where the alleged conduct of the nonparties is closely related to the contractual relationship, a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. (citation omitted)); *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir.2000) ([A] signatory ... cannot have it both ways: it cannot, on the one hand, seek to hold the non-signatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitrations applicability because the defendant is a non-signatory. (citation omitted)); *Hugel, 999* F.2d at 209 (7th Cir.1993) (In order to bind a nonparty to a forum selection clause, the party must be closely related to the dispute such that it becomes foreseeable that it will be bound. (citations omitted)); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993) (requiring a signatory to arbitrate with a non-signatory at the non-signatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the non-signatory's obligations and duties in the contract ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.); *Cfirstclass Corp. v. Silverjet PLC*, 560 F.Supp.2d 324, 328 (S.D.N.Y.2008)) (finding that non-signatory manager and director had standing to enforce forum selection clause within contract related to the purchase of shares); *Ishimaru v. Fung*, 2005 WL 2899680, at *17–18 (Del.Ch. Oct. 26, 2005) (holding that a non-signatory subsidiary could enforce the arbitration provision in an agreement executed by its parent company).

Agreements is different from that of the Share Sale Agreements. The Forum Selection Provision in the Subscription Agreements provides in relevant part: "English courts shall have jurisdiction over any disputes arising hereunder."[52] The Ashall Plaintiffs argue that this language is simply permissive and does not expressly require that disputes under the Subscription Agreements can only be brought in English courts.

But, that argument overlooks precedent that reads a provision stating that a court *shall* have jurisdiction over *any* dispute as a mandatory, rather than permissive, grant of jurisdiction. For example, in *Prestancia Mgmt. Group Inc. v. Va. Heritage Found., II LLC,* this court interpreted an almost identical forum selection clause and concluded that it was mandatory.[53] The forum selection clause in *Prestancia* provided: "The jurisdiction for any controversy arising [under the Security Agreement] shall be in the courts of competent jurisdiction of Loudoun County, Virginia."[54] The court focused on the use of the word "any" and reasoned that "use of the word 'any' . . . connotes all-encompassing inclusion."[55]

Furthermore, even if the Subscription Agreements' language did not clearly indicate exclusivity—which it does—the rule that related contemporaneous documents should be read together[56] requires the Subscription Agreements' Forum Selection Provision to be read as mandating jurisdiction in the English courts as the Share Sale Agreements' Forum Selection Provi-

**52.** Subscription Agreements § 4(c).

**53.** 2005 WL 1364616, at *7.

**54.** *Id.* (alteration in original).

**55.** *Id.* The Ashall Plaintiffs argue that the Forum Selection Provision in the Subscription Agreements is "materially identical" to the forum selection clause at issue in *Eisenbud v. Omnitech Corp. Solutions, Inc.* 1996 WL 162245. The forum selection provision in *Eisenbud* provided that "the parties further agree the Court having *competent jurisdiction* over all legal and equitable matters shall be the Superior Court of the State of New Jersey in Bergen County, New Jersey." *Id.* at *1 (emphasis added). In interpreting that provision, this court found that this language permitted but did not mandate jurisdiction in the New Jersey Court. *Id.* at *2. But, this language is distinguishable: in *Eisenbud*, the provision simply identified a "competent jurisdiction;" here, as in *Prestancia*, the forum selection clause requires that "any" disputes "shall" be submitted to a particular jurisdiction.

**56.** *See Crown Books Corp. v. Bookstop Inc.,* 1990 WL 26166, at *1 (Del.Ch. Feb. 28, 1990) ("[I]n construing the legal obligations created by [a] document, it is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters."); *see also* 17A C.J.S. *Contracts* § 315, at 337 (1999) ("In the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction are construed together as a single contract, as though they were as much one in form as they are in substance, in order to determine the intent, rights, and interests of the parties."); 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:26, at 239–42 (4th ed. 1999) ("Apart from the explicit incorporation by reference of one document into another, the principle that all writings which are part of the same transaction are interpreted together also finds application in the situation where incorporation by reference of another document may be inferred from the context in which the documents in question were executed. Thus, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other."); RESTATEMENT (SECOND) OF CONTRACTS § 202(2) (1981) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.").

sion does. Not only were the Share Sale Agreements and the Subscription Agreements executed contemporaneously, but they also effectuated separate steps of a single integrated scheme for changing ROK U.K. Group shares ultimately into ROK Delaware shares.

█ Finally, there is an important policy reason for adjudicating all of the disputes relating to these two agreements in one court. Because the two agreements are intertwined, the wisdom of the rule that related agreements are to be read together is apparent: bifurcating this dispute—so as to send claims arising from the Share Sale Agreements to the English courts, but to keep claims arising from the Subscription Agreements here in this court—would result in obvious inefficiencies and confusion. Those inefficiencies and the potential for injustice are serious enough that long-standing doctrines, such as res judicata and the Delaware Supreme Court's *McWane* doctrine,[57] have been developed to minimize claims splitting. Res judicata minimizes inefficiency and inequity by making a judgment binding as to all claims that could and therefore should have been brought in the initial litigation.[58]

And, *McWane*, which generally confines litigation to one forum,[59] serves the public's interest in the orderly administration of justice by discouraging forum shopping and by reducing the risk of conflicting verdicts.[60]

Here, where it is clear that the contract claims *must* be brought in England, it makes little sense to allow the Ashall Plaintiffs' claims to be split. Under *McWane* and other analogous doctrines, the Ashall Plaintiffs ought to be bound for fairness and efficiency's sake to litigate in one place, and not force the defendants to unnecessarily expend resources on what would essentially be the same defense in multiple venues. That is especially so when all the Ashall Plaintiffs claims are governed by English law, all the key parties to this case reside in the United Kingdom,[61] and all the key events took place in the United Kingdom. Because this is not an internal affairs case, the fact that ROK U.K. Group was eventually to be a Delaware entity has no important relation to the underlying claims or events. That is, the presence of a Delaware corporation in a dispute is most relevant when Dela-

**57.** *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.*, 263 A.2d 281 (Del.1970).

**58.** *See Betts v. Townsends*, 765 A.2d 531, 534 (Del.2000) (stating that the doctrine of res judicata forecloses a party from "bringing a second suit based on the same cause of action after a judgment has been entered in a prior suit involving the same parties"). The United States Supreme Court gave the classic formulation over a century ago:

[T]he judgment, if rendered upon the merits, constitutes an absolute bay to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible

matter which might have been offered for that purpose.

*Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1876). The Delaware Supreme Court has described the doctrine's purpose as follows: "The fundamental basis of the doctrine of res judicata, and of its subsidiary rule, collateral estoppel, is that in the public interest a litigant may have one day in court but not two." *Malone Freight Lines, Inc. v. Johnson Motor Lines, Inc.*, 148 A.2d 770, 775 (Del. 1959).

**59.** *McWane*, 263 A.2d at 283 (deferring to plaintiff's initial choice of forum where the Delaware action is not the first filed).

**60.** *Lisa, S.A. v. Mayorga*, 993 A.2d 1042, 1047, 2010 WL 1553768, at *4 (Del. Apr. 20, 2010).

**61.** *See supra* note 4.

ware's corporate law is at issue, or when Delaware entities use Delaware contract law to govern their relationship,[62] neither of which is the case here. Therefore, disputes relating to both the Share Sale Agreements and the Subscription Agreements should be heard together.

 The Ashall Plaintiffs also argue that their claims fall outside the scope of the Forum Selection Provision in the Subscription Agreements because that provision is limited to claims "arising hereunder."[63] The Ashall Plaintiffs' contract-based claims, which allege breach of both the Subscription Agreements and the Share Sale Agreements,[64] are obviously within the scope of Subscription Agreements' Forum Selection Provision.[65] Therefore, the question is whether the Ashall Plaintiffs' non-contract claims are within the scope of the Forum Selection Provision. Courts in Delaware and other jurisdictions have found that "[a] forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship."[66] That rule not only prevents par-

---

**62.** See Edgar v. MITE Corp., 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982) ("[O]nly one state should have authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders."); McDermott, Inc. v. Lewis, 531 A.2d 206, 216 (Del. 1987) (reasoning that application of a single state's law to govern the internal affairs of a corporation "serves the vital need for a single, constant and equal law to avoid the fragmentation of continuing, interdependent internal relationships" and that, "[w]ith the existence of multistate and multinational organizations, directors and officers have a significant right ... to know what law will be applied to their actions"); Hynson v. Drummond Coal Co., 601 A.2d 570, 576 (Del.Ch.1991) ("[T]he internal affairs of a corporation ... are governed by the law of the corporation's domicile.").

**63.** See supra page 1243.

**64.** See Compl. ¶ 73 ("Plaintiffs have suffered damages as a direct and proximate result of ROK's breach of the *contracts* between the parties for the purchase of unrestricted stock.") (emphasis added).

**65.** In their answering brief, the Ashall Plaintiffs nevertheless make the argument that, because the dispute is over ROK Delaware shares, the Subscription Agreements, which addressed the issuance of ROK U.K. Group shares, are not implicated at all, and therefore none of their claims—contract or otherwise—arise under the Subscription Agreements. Pl.'s Ans. Br. 9. But this argument must be rejected because—as the Ashall Plaintiffs' own complaint alleges—the Subscription Agreements and the Share Sale Agreements are part of a single, integrated investment scheme. See Compl. ¶¶ 54–55, 116–18, 125, 129, 130. The Ashall Plaintiffs cannot on one hand argue that the Subscription Agreements should be rescinded because they are part of a single scheme, and on the other hand argue that the Subscription Agreements are not implicated at all when they want to avoid the agreements' Forum Selection Provision. See id. at ¶ 125.

**66.** Simon, 2000 WL 1597890, at *3; see also supra note 33. An opinion from the United States District Court for the Southern District of New York deciding the scope of a forum selection clause aptly summarizes the logic behind this rule:

A forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship.... Thus, the circuit courts have held that a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend on the existence of a contractual relationship between the parties ... or if resolution of the claims relates to interpretation of the contract, ... or if the tort claims involve the same operative facts as a parallel claim for breach of contract.... [The] common thread running through these various formulations [of the rule] is the inquiry whether the plaintiff's

ties from escaping their contractual commitments to adjudicate their disputes in a particular forum but also allows the court to police the important boundary between the application of contract and tort doctrines. Tort claims related to a contractual relationship frequently require a determination of the contract's scope and of how the rights and duties created by that contract interact with the parties' general tort duties—questions that are typically freighted with public policy concerns.[67]

Here, the Ashall Plaintiffs' non-contract claims depend upon the same set of facts as their contract claims. That is, all of the claims involve the Ashall Plaintiffs' initial decision to invest, their execution of the Subscription Agreements and the Share Sale Agreements, and the parties' performance of their obligations under those agreements.[68] Resolution of these claims will require an analysis of the Subscription Agreements and the Share Sale Agreements.

Furthermore, because they allege that the defendants' fraudulent and tortious behavior has overridden the promises made in the agreements, the Ashall Plaintiff's non-contract claims necessarily raise the question of how the boundary between contract and tort is to be drawn in this case. That is, the Ashall Plaintiffs' central argument to give weight to the defendants' oral representations over the written contract terms requires the court to determine the extent to which the plain terms of the agreements preclude the Ashall Plaintiffs from arguing they were duped into investing in the defendants' scheme. Because the Share Sale Agreements provide that the Ashall Plaintiffs were to receive restricted, unregistered shares and the contemporaneously-entered Subscription Agreements contain an integration clause that plainly states that those agreements supersede all prior written or oral understandings,[69] striking the appropriate balance between the competing values served by tort and contract may well require an intricate consideration of the public policies of the jurisdiction whose law controls the parties' relationship—that is, Eng-

---

claims depend on rights and duties that must be analyzed by reference to the contractual relationship.
*Direct Mail Prod. Serv. Ltd. v. MBNA Corp.,* 2000 WL 1277597, at *6 (S.D.N.Y. September 7, 2000) (internal citations omitted).

**67.** The balancing of the public's interest in truthfulness with its interest in the predictability afforded by consistent enforcement of contractual promises that occurs when courts examine the extent to which contractual provisions, such as integration clauses, can exculpate fraud claims is an example of the policy issues that arise at the intersection of contract and tort. *See Abry Partners V, L.P. v. F & W Acquisition LLC,* 891 A.2d 1032, 1055–65 (Del.Ch.2006) (discussing the public policies implicated in the enforcement of integration clauses where fraud is alleged); *see also* Allen Blair, *A Matter of Trust: Should No–Reliance Clauses Bar Claims for Fraudulent Inducement of Contract?,* 92 Marq. L.Rev.

423 (2009) (discussing the moral theories and public policies informing the case law, and arguing that no-reliance clauses can—and do—serve valuable contract functions); Kevin Davis, *Licensing Lies: Merger Clauses, the Parol Evidence Rule and Pre–Contractual Misrepresentations,* 33 Val. U.L.Rev. 485 (1999) (discussing the tension between the policies behind rules supporting contractual freedom and rules that relax the enforcement of contracts in certain circumstances, such as fraud).

**68.** *Cf. U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.—Petrobras,* 2001 WL 300735 (S.D.N.Y. Mar.27, 2001) (finding that a forum selection clause providing that "any question arising from the performance of this Contract" encompassed claims for fraud, negligent misrepresentation, tortious interference with contract, and unjust enrichment).

**69.** *See supra* page 1243–44.

land.[70] How far can a contract go to exculpate fraud? [71] Does the integration clause of the Subscription Agreements encompass the Share Sale Agreements too? Weighing the various English public policies implicated by these questions is best accomplished by an English court that is expert in English law.

### IV. *Conclusion*

Because all of the Ashall Plaintiffs' claims fall under the forum selection provisions of the Share Sale Agreements and the Subscription Agreements, and because those provisions clearly mandate that the English courts have exclusive jurisdiction over any disputes arising from the contracts, the defendants' motion to dismiss must be GRANTED under Rule 12(b)(3). IT IS SO ORDERED.

---

**70.** The choice of law clauses in the Subscription Agreements and Share Sale Agreements, which choose English law to govern the agreements, are also applicable to the non-contract claims because the claims arise from the parties' contractual relationship. *See Abry*, 891 A.2d at 1047–48.

**71.** In its *Abry* decision, this court explored many of the difficult issues raised by fraud claims that arguably involve representations of fact contrary to or disclaimed by an integrated contract, or which seek a remedy for a misrepresentation of fact incorporated in the contract that is barred by the contract's limitations on remedies. *Id.* at 1055–65. For example, in that case, the court acknowledged

the Restatement's rule that "[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy." *Id.* at 1059 (quoting RESTATEMENT (SECOND) OF CONTRACTS 195 (1981)). But, the court eschewed the broad recklessness standard in the Restatement as Delaware common law and embraced a more contractarian rule based upon Delaware public policy that a contractual remedy limitation is effective to bar a rescission claim based on reckless misstatements, and will be overridden as a matter of public policy only if the plaintiff proves that the defendant intentionally lied about a representation of fact. *Id.* at 1064.