# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| GERMANINVESTMENTS AG and RICHARD HERRLING, individually and on behalf of AHMR GmbH, | : : : : | |
| Plaintiffs, | : : | |
| v. | : : | **C.A. No. 2018-0666-JRS** |
| ALLOMET CORPORATION and YANCHEP LLC | : : : | |
| Defendants. | : : : | |

## MEMORANDUM OPINION

Date Submitted: March 5, 2019
Date Decided: May 23, 2019

R. Craig Martin, Esquire, Ethan H. Townsend, Esquire and Peter H. Kyle, Esquire of DLA Piper LLP (US), Wilmington, Delaware, Attorneys for Plaintiffs.

John P. DiTomo, Esquire, Ryan D. Stottmann, Esquire and Coleen Hill, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Judges quickly learn to take certain things lawyers say with a grain of salt. "Just one more question" typically means the lawyer will ask at least three or four more. "I will be brief" typically means at least another ten minutes. And, "this is a simple case" often means the case is anything but simple. Here, the parties on both sides of the "v" maintain that the issues presented in the motion to dismiss before the Court are not just simple; they are "*exceedingly* simple."[1] This, of course, begs the question: if the issues are so simple, then why are the parties litigating them? I digress . . . .

The motion to dismiss invokes Court of Chancery Rule 12(b)(3) and asks the Court to declare that Delaware is an improper venue for resolution of this dispute based on a forum selection clause within a Restructuring and Loan Agreement ("R&L Agreement") that purportedly designates Vienna, Austria as the exclusive forum. The gravamen of the complaint is that certain parties to this litigation contemplated the formation of a joint venture and that, in the midst of their negotiations, Plaintiffs caused loans to be extended to one of the Defendants under the R&L Agreement that remain unpaid and outstanding. Plaintiffs seek specific performance of various aspects of the R&L Agreement so that they can realize at

---

[1] Pls.' Answering Br. in Opp'n to Defs. Allomet Corp. and Yanchep, LLC's Mot. to Dismiss ("PAB") at 1 (emphasis supplied); Defs. Allomet Corp. and Yanchep LLC's Reply Br. in Supp. of Their Mot. to Dismiss at 1 (emphasis supplied).

1

least some benefits of their bargain. That contract is governed by Austrian law. Nevertheless, as to the portion of their specific performance claim that would have the Court compel Defendants to issue stock to Plaintiffs as contemplated by the contract, Plaintiffs invoke 8 *Del. C.* Section 168(a) ("Section 168(a)") as the basis upon which the Court can and should direct the stock issuance to occur.[2]

Not surprisingly, the parties have presented differing interpretations of how Austrian law supports their respective positions regarding the meaning and scope of the R&L Agreement's forum selection clause. These disagreements relate to basic questions, including: (i) is the clause at issue actually a forum selection clause and, if so, is it mandatory; (ii) can the clause be enforced against a party who has not agreed to be bound by the specific regulations that Defendants argue would render the clause mandatory and enforceable; and (iii) can claims brought under Section 168(a) be subject to an Austrian forum selection clause?

After carefully reviewing the applicable law, with due respect to counsel, I cannot agree the issues presented are "simple" in any degree of that term. Nevertheless, after carefully reviewing the applicable Austrian law, I am satisfied

---

[2] *See* 8 *Del. C.* § 168(a) ("If a corporation refuses to issue new uncertificated shares or a new certificate of stock in place of a certificate theretofore issued by it, or by any corporation of which it is the lawful successor, alleged to have been lost, stolen or destroyed, the owner of the lost, stolen or destroyed certificate or such owner's legal representatives may apply to the Court of Chancery for an order requiring the corporation to show cause why it should not issue new uncertificated shares or a new certificate of stock in place of the certificate so lost, stolen or destroyed.").

the only fair reading of that law is that the forum selection clause is mandatory and enforceable. Accordingly, there is no basis to require Defendants to answer Plaintiffs' claims in Delaware. The motion to dismiss, therefore, must be granted. For reasons explained below, however, the dismissal will be without prejudice.

## I. FACTUAL BACKGROUND

I draw the facts from the allegations in the Complaint, documents incorporated by reference or integral to the Complaint and additional materials submitted by the parties in connection with Defendants' motion to dismiss.[3] For purposes of this motion to dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[4]

### A. The Parties and Relevant Non-Parties

Plaintiff, Germaninvestments Aktiengesellschaft (AG) ("Germaninvestments"), is a Swiss holding company formed to manage assets for the Herrling family.[5] Its equity is divided among the family members as follows: Richard Herrling holds 34%; Anja Herrling holds 17%; Philip Herrling holds 24.5%;

---

[3] *Troy Corp. v. Schoon*, 2007 WL 949441, at *2 (Del. Ch. Mar. 26, 2007) (holding that, under Rule 12(b)(3), "the court is not shackled to the plaintiff's complaint and is permitted to consider extrinsic evidence from the outset.") (internal quotation omitted).

[4] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

[5] Verified Complaint ("Compl.") ¶ 4.

and Johannes Herrling holds 24.5%.[6]  Plaintiff, Richard Herrling ("Herrling"), is a German citizen who resides in Switzerland.[7]

Defendant, Allomet Corporation ("Allomet"), is a Delaware corporation founded in 1998.  It manufactures high-performance, tough-coated metal powders using a proprietary technology for coating industrial products.[8]

Non-party, Fobio Enterprises, Ltd. ("Fobio"), a Hong Kong limited company, is the majority owner of Allomet,[9] initially owning 52,249 of its 54,132 outstanding shares of common stock and all of its 1,304 shares of preferred stock.[10]  In April 2016, Fobio acquired the remaining 1,883 shares of Allomet's common stock, previously held by the Estate of Richard E. Toth.[11]

Defendant, Yanchep LLC ("Yanchep"), is a Delaware limited liability company with a single member, Mirta Hereth.  Its only assets are the two parcels of

---

[6] *Id.*

[7] Compl. ¶ 5.

[8] Compl. ¶¶ 6, 12.

[9] Compl. ¶¶ 9–10, 41, 50.

[10] Compl. ¶ 41.

[11] Compl. ¶¶ 50, 52.  The R&L Agreement states that the Toth shares were "acquired by [Dr. Hannjörg Hereth] or Fobio pursuant to a purchase contract dated 12 April 2016— payment of USD 250,000 still outstanding[.]"  Compl. Ex. B ("Ex. B") ¶ 4.

4

real property in North Huntingdon where the Allomet headquarters are situated and a lease, dated November 8, 2011, between Yanchep and Allomet.[12]

Non-party, AHMR GmbH ("AHMR"), an Austrian limited company, was formed solely for the purpose of holding all of the equity interest in Allomet and Yanchep, Allomet's intellectual property and Yanchep's assets.[13] Non-party, Dr. Hannjörg Hereth ("Hereth"), a citizen of Switzerland, owns 100% of Fobio through various entities.[14] Hereth is also a director and the Chairman of the Board of Directors of Allomet.[15]

## B. Parties Negotiate A Potential Joint Venture To Keep Allomet Afloat

Allomet struggled with declining performance as early as 2002. By the end of 2017, Allomet amassed net operating loss carryforwards of $25 million and $42.5 million in debt owed to its controller, Fobio.[16]

In mid-2016, Tanja Hausfelder, an insurance professional who apparently knew or worked with both Herrling and Hereth, advised Herrling that Hereth was

---

[12] Compl. ¶¶ 7, 45; Compl. Exs. A, D.

[13] Compl. ¶ 8.

[14] Compl. ¶ 10.

[15] Compl. ¶¶ 10, 13–14.

[16] Compl. ¶ 16.

looking for a joint venture partner to join Allomet.[17]   On October 5 and 6, 2016, Herrling and Hereth met in Switzerland, where Hereth confirmed he was interested in forming a joint venture for the purpose of raising capital for the struggling Allomet.[18]

After their meeting in Switzerland, Herrling and Hereth discussed a general structure for their joint venture.[19]  Specifically, the plan contemplated the formation of an Austrian holding company that would own (i) Allomet's intellectual property rights, (ii) the outstanding stock and membership interests in Allomet and Yanchep and (iii) all of Yanchep's buildings, land and rights.[20]  Because Fobio had been the principal source of financing for Allomet since its founding,[21] the parties discussed whether it would be appropriate to assign or otherwise transfer Fobio's claims against Allomet to the joint venture.[22]

As the parties negotiated the joint venture, it was clear that Allomet required additional funding to continue its operations.  Accordingly, beginning January 31,

---

[17] Compl. ¶ 17.

[18] Compl. ¶ 18.

[19] Compl. ¶¶ 19–21.

[20] Compl. ¶¶ 19–20.

[21] Compl. ¶ 29.  Fobio had extended a total of $42,525,475.25 in loans to Allomet.  *Id.*

[22] Compl. ¶ 20; Ex. B ¶ 4.

2017, Herrling extended a series of loans to Allomet to keep it afloat.[23]   Herrling initially loaned $500,000.[24]   On March 3, 2017, Herrling loaned $150,000.[25]   And, on May 10, 2017, Herrling loaned another $200,000.[26]

## C. The Parties Enter the R&L Agreement

On May 29, 2017, a draft of what was to become the R&L Agreement was circulated amongst the various parties.[27]   The express purpose of the R&L Agreement was "to regulate the funding of the Allomet Corporation until the establishment, under Austrian law, of a holding company in which [Herrling] and [Hereth] shall acquire a 50% stake and which shall later hold all of the shares (100%) of the Allomet Corporation."[28]   The R&L Agreement memorialized the terms of the loans Herrling had extended to Allomet, the potential framework for continued discussions concerning a potential Austrian-based joint venture and the funding each party was expected to contribute to the joint venture.[29]   It also detailed a loan

---

[23] Compl. ¶ 21.

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Compl. ¶ 22; *see* Ex. B.

[28] Compl. ¶¶ 22–23.

[29] Ex. B at 2, Pmbl., ¶¶ 1, 4.

schedule reflecting that Herrling would make loans to the entity in four tranches totaling $950,000.[30] The loans would accrue interest at 5.5% interest per annum without pre-payment penalties or amortization.[31]

Especially relevant here, the R&L Agreement states: "The agreement is subject to Austrian law. The place of jurisdiction is Vienna."[32]

### D. Formation of AHMR

The parties formed the Austrian holding company contemplated by the R&L Agreement, AHMR, on July 3, 2017.[33] AHMR was registered with the commercial

---

As the holding company has yet to be established, the initial payment shall be made by [Herrling], representatively, in the form of a loan to the Allomet Corporation. [Herrling] shall contribute a sum of EUR 10 million plus USD 250,000—Toth—over a period of 5 years. The payments shall be made in consultation with [Hereth], according to Allomet's liquidity requirements and based on an evaluation of the market need.

Ex. B at 2, Pmbl.

[30] Ex. B ¶ 1.

[31] Ex. B ¶¶ 3, 5. The loans were extended "until" July 31, 2017, with a one-time option of a 6-month extension "agreed mutually between [Hereth] and [Herrling]." Ex. B ¶ 4. During that time, "unless the parties decide[d] otherwise, an Austrian holding company [was] to be established in which the following assets of Allomet and Yanchep shall be incorporated:" (1) Allomet's outstanding stock; (2) all of Allomet's IP rights registered as of July 31, 2017; and (3) Yanchep's real property owned as of July 31, 2017." *Id.* The R&L Agreement recognized that "[i]f the aforementioned steps have not been implemented by 31/07/2017, the loan shall become due for repayment immediately or the one-time extension may be agreed mutually between [Hereth] and [Herrling]." *Id.*

[32] Ex. B ¶ 9.

[33] Compl. ¶ 31.

8

register of the commercial court in Vienna, Austria the following month.[34]  Its initial stockholders were Hereth, Herrling, Hausfelder and Hereth's son-in-law, Valentin Biedermann.[35]  On December 14, 2017, Herrling allegedly transferred his share of AHMR to Germaninvestments, the holding company for his family's investment assets.[36]

AHMR is a "manager managed" entity with two groups of managing directors: Group A comprises Hereth, Biedermann and his wife, Mirta Hereth by proxy; Group B comprises Herrling, Hausfelder by proxy and Anja Herrling by proxy.[37]  Both groups' managing directors must agree on AHMR's major decisions as stated in AHMR's governance documents and as provided by Austrian law.[38]

## E. Herrling "Walks" From the Negotiations

From May 2017 through January 2018, while the parties continued to negotiate their joint venture, Herrling visited Allomet numerous times and received

---

[34] *Id.*

[35] Compl. ¶ 32.

[36] Compl. ¶¶ 4, 33.  AHMR's resulting stockholders are Hereth (49%), Germaninvestments (49%), Biedermann (1%) and Hausfelder (1%).  *Id.*  Hausfelder allegedly assigned her litigation rights to Germaninvestments.  Compl. ¶ 34.

[37] Compl. ¶ 35.

[38] *Id.*  Although not important to the outcome here, I note that the Group A and Group B managing directors have not agreed that this litigation should be initiated on behalf of AHMR.  Compl. ¶¶ 35, 82.

detailed information on Allomet's operations and finances.[39]  He also extended additional loans to Allomet, either individually or through Germaninvestments, bringing Allomet's total obligation to Herrling to $3,665,000.[40]  While he "book[ed]" these loans under "the terms of the [R&L] Agreement,"[41] the R&L Agreement only references $950,000 in loans.[42]  It is alleged that the parties discussed, but never finalized, a loan agreement among Herrling and Allomet to address the loans outside the R&L Agreement.[43]

On January 29, 2018, the day before the R&L Agreement was to expire, AHMR's shareholders entered into a Supplementary Agreement, the purpose of which was to allow time for the parties to secure additional tax advice regarding the structure of the joint venture.[44]  In this regard, the parties engaged BDO USA in Vienna to assist in creating a series of non-binding documents that outlined the transaction's structure.[45]

---

[39] Compl. ¶ 35.

[40] Compl. ¶ 36.

[41] Compl. ¶ 37.

[42] *See* Compl. ¶¶ 24, 26; Compl. Ex. G ("Ex. G") ¶ 4.

[43] *Id.*

[44] *See* Ex. G.

[45] *Id.*  Compl. Exs. C–F.

Under the Supplementary Agreement, the parties were to "regard the already signed [Transaction Agreements] as definitive" and agreed they would "then be Executed/Implemented as such."[46] The Supplementary Agreement provided, however, that the documents referenced there are not legally binding and did not execute the joint venture. Specifically, the Supplementary Agreement stated the documents referenced had not yet "been legally signed," had not yet "become legally binding," and did not represent the "full legal implementation" of the joint venture.[47] It also deferred the parties' funding obligations and recognized that the potential joint venture still had to be negotiated.[48] By its terms, the Supplementary Agreement expired in March 2018.[49]

By mid-April 2018, the parties had reached an impasse.[50] Herrling had not received the "transparency" he expected and believed "important business decisions were negotiated without [him.]"[51] On May 30, 2018, the parties stopped all joint

---

[46] Compl. ¶ 62.

[47] *See* Ex. G ¶ 4.

[48] *See* Ex. G ¶¶ 3, 4.

[49] *See* Ex. G

[50] *See* Compl. ¶ 71; *see* Compl. Ex. H.

[51] Compl. ¶ 65.

venture discussions.[52]  With hope for an agreement now lost, Herrling offered to "walk away from the [R&L] Agreement with Hereth, provided, of course, that Allomet return all funds to . . . Herrling and Germaninvestments, plus costs."[53] For his part, Hereth made clear that neither Herrling nor Germaninvestments possessed any interest in Allomet.[54]  Herrling then offered to return only "a fraction" of the money Herrling had either loaned to (Hereth's view) or invested in (Herrling's view) Allomet.[55]

## F. Procedural Posture

Plaintiffs filed their Verified Complaint on September 7, 2018.[56]  Count I seeks to enforce the R&L Agreement and related agreements invoking 8 *Del. C.* Section 168 to require Allomet to "reissue" its stock certificates in AHMR's name as contemplated by the contract.[57]  Count II alleges breach of the R&L Agreement and related agreements and seeks specific performance of those agreements'

---

[52] Compl. Ex. I.

[53] Compl. ¶ 75.

[54] Compl. ¶ 76.

[55] *Id.*

[56] Compl.

[57] Compl. ¶¶ 80–85. *See also* Compl. ¶ 40. ("As agreed in the [R&L] Agreement, Fobio, AHMR, and Dr. Hereth entered into a Stock Purchase Agreement ("SPA"), dated January 24, 2018, under which AHMR obtained all of the outstanding shares of Allomet from Fobio.").

12

purported requirements that Allomet transfer its equity to AHMR, transfer its IP rights to AHMR and transfer Yanchep's membership interests and real property to AHMR.[58]  Count III alleges unjust enrichment as a result of Defendants' failure to transfer all of Allomet's outstanding stock, Allomet's intellectual property and Yanchep's membership units and real property to AHMR as agreed to in the R&L Agreement.[59]

The parties agreed to a status quo order that was entered on October 11, 2018.[60]  Defendants filed their Motion to Dismiss and opening brief on December 10, 2018.[61]  The thrust of the motion is that the Court should specifically enforce the forum selection clause in the R&L Agreement and dismiss this action so that the parties may litigate these claims in Vienna, Austria as they agreed.  Plaintiffs oppose the motion and maintain the clause Defendants invoke is not a forum selection clause and, even if it is, it is either not mandatory or not enforceable with respect to their claim under Section 168(a).

---

[58] Compl. ¶¶ 87–95.

[59] Compl. ¶¶ 97–102.

[60] D.I. 17.

[61] D.I. 26, 27.

13

## II.  LEGAL ANALYSIS

"The proper procedural rubric for addressing a motion to dismiss based on a forum selection clause is found under Rule 12(b)(3), improper venue.  Although Delaware courts have, in the past, framed a forum selection clause analysis as jurisdictional in some sense, recent cases have all proceeded under Rule 12(b)(3) . . . ."[62]  When addressing a motion under Rule 12(b)(3), the court "is not shackled to the plaintiff's complaint" and is "permitted to consider extrinsic evidence from the outset."[63]

### A.  Construing the Forum Selection Clause

In cases involving a contractual agreement to litigate in a particular forum, "the well-settled rule is that the court should give effect to the terms of private agreements to resolve disputes in [that] forum out of respect for the parties' contractual designation."[64]  With this in mind, "[t]he courts of Delaware [will] defer to forum selection clauses and grant Rule 12(b)(3) motions to dismiss where the parties use express language clearly indicating that the forum selection clause

---

[62] *Bonanno v. VTB Hldgs., Inc.*, 2016 WL 614412, at *5 (Del. Ch. Feb. 8, 2016) (internal quotation omitted) (collecting cases).

[63] *Troy Corp.*, 2007 WL 949441, at *2 (internal quotation and citation omitted).

[64] *Id.*  *See also* DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 5-4[a], at 5-53 to 5-54 (2005) (collecting cases)*; Ashall Homes Ltd. v. ROK Entm't Gp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010) ("The courts of Delaware defer to forum selection clauses . . . .").

14

excludes all other courts before which those parties could otherwise properly bring an action."[65] In other words, "[f]or a forum selection clause to be strictly binding [under Delaware law]," the "contractual language [must be] crystalline" in stating the parties' intent to litigate only in the designated forum.[66]

As noted, the R&L Agreement, at Section 9, states "[t]he agreement is subject to Austrian law. The place of jurisdiction is Vienna."[67] The threshold question is whether this contractual language should be construed as a mandatory, exclusive forum selection clause or something else. To answer that question, the Court must first determine what law to apply. Here, the choice of law boils down to a choice between Delaware or Austrian law.

### 1. Austrian Law Applies

"When a contract contains a forum selection clause, this court will interpret the forum selection clause in accordance with the law chosen to govern the contract."[68] The parties agree Austrian law applies to the R&L Agreement.[69]

---

[65] *Scanbuy, Inc. v. NeoMedia Techs., Inc.*, 2014 WL 5500245, at *2 (Del. Ch. Oct. 31, 2014) (internal quotation omitted).

[66] *Eisenbud v. Omnitech*, 1996 WL 162245, at *1 (Del. Ch. Mar. 21, 1996).

[67] Ex. B ¶ 9 ("Section 9").

[68] *Ashall Homes Ltd.,* 992 A.2d at 1245.

[69] Defs. Allomet Corp. and Yanchep LLC's Opening Br. in Supp. of Their Mot. to Dismiss ("DOB") at 1; PAB at 8.

"Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."[70] Here, this action is undeniably about Plaintiffs' claims to enforce the Austrian law-governed R&L Agreement.[71] The R&L Agreement contemplates the formation of an Austrian joint venture. There can be no doubt, therefore, that Austria "bears [a] material relationship to the transaction."[72] Thus, Austrian law will govern the construction of Section 9 of the R&L Agreement.[73]

---

[70] *J.S. Alberici Const. Co. v. Mid-W. Conveyor Co.*, 750 A.2d 518, 520 (Del. 2000).

[71] Each count for relief relates directly to the R&L Agreement. There is no dispute to resolve under the SPA if the R&L Agreement's conditions precedent were not fulfilled (Count I). If the obligations under the R&L Agreement were not triggered, there could be no specific performance of those obligations (Count II). And, until a court determines that the loans Herrling and Germaninvestments made to Allomet are not governed by the R&L Agreement, there is likely no claim for unjust enrichment (Count III). *See Kuroda v. SPJS Hldgs., LLC*, 971 A.2d 872, (Del. Ch. 2009) (holding, under Delaware law, that "[a] claim for unjust enrichment is not available if there is a contract that governs relationship between the parties that gives rise to the unjust enrichment claim.").

[72] *J.S. Alberici Const. Co.,* 750 A.2d at 520.

[73] The process by which this court interprets and declares foreign law is governed by Court of Chancery Rule 44.1. That rule provides: "A party who intends to raise an issue concerning the law of a foreign country shall give notice in his pleadings or other reasonable written notice. The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43. The Court's determination shall be treated as a ruling on a question of law." Here, the parties have provided extensive foreign authority and affidavits interpreting that authority. While the Court could convene a hearing to take testimony regarding the parties' competing views of the governing foreign law, there is no need to put the parties or the Court through that added burden because the law is, in my view, clear. *See Kostolany v. Davis*, 1995 WL 662683, at *2 (Del. Ch. Nov. 7, 1995) ("The parties have filed expert affidavits on Dutch and French law. Although the court may consider testimony, the issues of foreign law have been adequately developed by affidavit and

16

Under Austrian law, choice of forum and consent to jurisdiction provisions in contracts are governed by Article 25 of the European Regulation on Jurisdiction and Recognition and Enforcement of Judgments in Civil and Commercial Matters (the so-called "Brussels Regulation").[74]  Since Austria subscribes to the Brussels Regulation, that law will apply in any civil and commercial dispute invoking a Member State's jurisdiction.[75]  Article 25 of the Brussels Regulation provides, in relevant part:

---

argument.  There is therefore no need to cause additional expense and delay by [conducting an evidentiary hearing]."); *Deuley v. DynCorp Intern., Inc.*, 2010 WL 704895, at *3 (Del. Super. Ct. Feb. 26, 2010) (deciding disputed issue of foreign law at the pleadings stage).  Although I am satisfied that the law is clear, as might be gleaned from the analysis that follows, the process by which I have reached this conclusion was by no means "simple."

[74] DOB Ex. 1 ("Brussels Reg.").

[75] Brussels Reg. Art. 1.  Plaintiffs question whether the Brussels Regulation would trump "Austrian law" with respect to the construction and enforceability of Section 9.  Specifically, they maintain that, under Austrian law, "[i]n cases of doubt an agreed on jurisdiction only is an elective jurisdiction besides other possible places of jurisdiction."  PAB at 41.  Plaintiffs' attempt to create a conflict of law fails for two reasons.  *First*, Article 25 makes clear that there is no "doubt" here—unless the parties stated in Section 9 that they did not intend the courts in Vienna, Austria to have exclusive jurisdiction, their designation of those courts is deemed mandatory.  *See* Brussels Reg. Art. 25(1) ("Such jurisdiction shall be exclusive unless the parties have agreed otherwise.").  *Second*, Plaintiffs ignore that Austria supplanted its local law by ratifying the Brussels Regulation.  *See* Kritzer, INTERNATIONAL CONTRACT MANUAL § 55:17 (Transmittal Affidavit of Coleen Hill ("Hill Aff.")) (observing that the Brussels Regulation "overrides all prior treaties between Member States on jurisdiction and enforcement of judgments in civil and commercial disputes"); Hill Aff. Ex. A at 64 ("Article 25 Brussels 1 Regulation therefore considerably pushes back the area of application of the autonomous (national) law concerning the agreement on the place of jurisdiction.").

[i]f the parties, regardless of their domicile, have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction, unless the agreement is null and void as to its substantive validity under the law of that Member State. ***Such jurisdiction shall be exclusive unless the parties have agreed otherwise***.[76]

"The agreement conferring jurisdiction" is valid and enforceable if it is "in writing or evidenced in writing[.]"[77]

## 2. The Forum Selection Clause Is Mandatory and Enforceable

Forum selection clauses may be permissive or mandatory.[78] As understood in most United States jurisdictions, "[p]ermissive forum selection clauses, often described as 'consent to jurisdiction' clauses, authorize jurisdiction and venue in a

---

[76] Brussels Reg. Art. 25(1) (emphasis supplied). It is clear from this provision that what we might refer to as "venue" is subsumed within the Brussels Regulation's reference to "jurisdiction."

[77] Brussels Reg. Art. 25(1)(a). Plaintiffs' suggestion that the Brussels Regulation has no force in, and should not be enforced by, a Delaware court under the Hague Choice of Court Convention is not persuasive. The issue here is not whether this Court is bound to enforce the Brussel Regulations. The issue is whether the Court should enforce the parties' mandatory forum selection provision as construed under the law designated by the parties in their contract. In this regard, our Supreme Court has made clear that "[a] valid forum selection clause must be enforced, even if that clause designates a forum outside the United States." *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013). "The enforcement of an international forum selection clause is not an issue of comity. It is a matter of contract enforcement and giving effect to substantive rights that the parties have agreed upon." *Id*. at 387.

[78] *See Bonanno*, 2016 WL 614412, at *7.

designated forum, but do not prohibit litigation elsewhere."[79] In contrast, "[m]andatory forum selection clauses contain clear language that litigation will proceed exclusively in the designated forum."[80]

As stated, under Delaware law, if the forum selection provision does not state that it is exclusive in crystalline terms, our courts will construe the provision as permissive.[81] The Brussels Regulation, however, takes the opposite approach. Under Article 25, jurisdiction vested in a member state "shall be exclusive unless the parties have agreed otherwise."[82] This means that when parties designate a single "jurisdiction" as the "place" where they will resolve their disputes, that contractual designation will be enforced as a mandatory forum selection clause.[83]

---

[79] 14D Charles Allan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3803.1 (4th ed.) (2018 Westlaw Update) ("Wright & Miller"). *See also In re Oakwood Homes Corp.*, 342 B.R. 59, 65 (Bankr. D. Del. 2006) ("Forum selection clauses are classified as either mandatory or permissive. A mandatory forum selection clause grants exclusive jurisdiction to a particular forum. A permissive forum selection clause, on the other hand, is nonexclusive.").

[80] Wright & Miller, § 3803.1. *See also Bonanno*, 2016 WL 614412, at *7 n.67 (collecting cases under Delaware law holding that a mandatory forum selection clause will make clear that litigation must proceed in the designated forum).

[81] *Id.*

[82] Brussels Reg. Art. 25(1).

[83] Hill Aff. Ex. A at 58; *see also id.* at 62–64 ("[A]n agreement on the place of jurisdiction that [designates] the courts, or one of the courts of a member state, [will be] subject to Article 25 Brussels 1 Regulation, even if none of the parties has its headquarters (residence) in a member state," and will be deemed mandatory).

The Brussels Regulation contains a series of prefatory "Whereas clauses." Plaintiffs seize upon two of these clauses to argue that Article 25 does not actually mean what it says. Specifically, Plaintiffs argue that Whereas Clause 6 demonstrates "the Brussels Regulation itself does not aim to be applicable outside the EU."[84] Plaintiffs further argue that Whereas Clause 13 requires a "connection to the territory of an EU Member State."[85] Merging these clauses, Plaintiffs maintain a forum selection provision is not mandatory under Article 25 "in cases where only one of the parties (the plaintiff) is domiciled in a Member State while the defendant is not."[86] Thus, according to Plaintiffs, "the Austrian Supreme Court has denied applicability of the Brussels Regulation even though one of the parties to the proceedings was domiciled in a Member State."[87]

Not only are the Whereas Clauses within the Brussels Regulation likely not binding,[88] Article 25 makes clear that it applies "regardless of [the parties'] domicile."[89] It is not surprising, then, that since the adoption of the revised Brussels

---

[84] PAB at 45.

[85] PAB at 45–46.

[86] PAB at 45.

[87] *See* PAB at 45–46, Ex. 4.

[88] *See Gray v. Masten*, 1983 WL 142520, at *2 (Del. Ch. Aug. 16, 1983) (holding recital is not a binding covenant).

[89] Brussels Reg. Art. 25(1).

20

Regulation in 2015, the Austrian Supreme Court has applied Article 25 when enforcing a contractual forum clause regardless of the domicile of the litigants.[90] Contrary to Plaintiffs' argument, under Article 25's express terms, its reach is not limited to parties located within a Member State.[91]

Plaintiffs next invoke Article 8 and argue that this provision of the Brussels Regulation "provides that defendants can be sued where they are domiciled."[92] Of course, Plaintiffs ignore that Article 8 applies only to "person[s] domiciled in a Member State[;]" and neither Allomet nor Yanchep are domiciled in a Member State.[93] Moreover, to the extent Article 8 and Article 25 were at odds (they are not),

---

[90] *See, e.g.*, Austrian Supreme Court, Jan. 24, 2018, Docket No. 7 Ob 183/17p (Hill Aff. Ex. D) ("In this context, applicability of the Brussels I Regulation (Brussels I-VO) is not in doubt.  The question of effectiveness of the conclusion of an agreement on the court of jurisdiction therefore is according to Article 23 Brussels I Regulation (now Article 25 Brussels I Regulation 2012 – Brussels Ia-VO)."); Austrian Supreme Court, Oct. 28, 2016, Docket No. 9 Ob 68/16i  (Hill Aff. Ex. A).

[91] Hill Aff. Ex. A at 58 ("The recast [Brussels Regulation] adopts an expansion of the personal and geographical scope of application of forum selection clauses because it will no longer matter whether one of the parties has its domicile in one of the Member States."); *see also id.* at 62–64 ("[A]n agreement on the place of jurisdiction, that indicates the courts, or one of the courts of a member state, is subject to Article 25 Brussels 1 Regulation, even if none of the parties has its headquarters (residence) in a member state."); *Handy Guide to Jurisdiction Under Recast Brussels Regulation*, HERBERT SMITH FREEHILLS (2019) (Hill Aff. Ex. B) ("[T]here is no requirement that either party is domiciled within the EU. . . .  [A]rticle 25 will apply even if the jurisdiction clause is in an agreement between, for example, an American company and a Japanese company.").

[92] PAB at 49.

[93] Brussels Reg. Art. 8.

Article 31(2) makes clear that Article 25 controls in cases of contractual designations of "jurisdiction" by providing, "[w]ithout prejudice to Article 26,[94] where a court of a Member State on which an agreement . . . confers exclusive jurisdiction is seised, any court of another Member State shall stay the proceedings until such time as the court seised on the basis of the agreement declares that it has no jurisdiction under the agreement."[95]  Thus, the determination of whether Section 9 confers exclusive jurisdiction upon the courts of Vienna, Austria must be left to the courts of Vienna, Austria.[96]

---

[94] Article 26 provides that, notwithstanding a forum selection clause, a defendant may submit to the jurisdiction of another Member State through a general appearance. Plaintiffs' last-ditch attempt to avoid Section 9 by invoking Article 26 to argue that Defendants have waived enforcement of the forum selection clause either by seeking to have a Delaware court enforce the provision or by making a general appearance in Delaware is misguided.  PAB at 49.  Defendants have appeared for the purpose of seeking dismissal under Chancery Rule 12(b)(3) because Plaintiffs have chosen to ignore the forum selection clause to which they agreed to be bound.  There has been no waiver here.

[95] Brussels Reg. Art. 31(2).  As used in this section, when a court is "seised," a case has been filed within that court.  *Id.*

[96] Plaintiffs also twist Articles 27 and 24 in their effort to avoid Article 25.  PAB at 48–49. Article 27 states "[w]here a court of a Member State is seised of a claim which is principally concerned with a matter over which the courts of another Member State have exclusive jurisdiction by virtue of Article 24, it shall declare of its own motion that it has no jurisdiction."  Brussels Reg. Art. 27.  Article 27 does not mention Article 25.  It does mention Article 24.  But that regulation applies only to the exclusive jurisdiction of Member States that exists by reason of immovable property or related matters where the situs or legal status of the property derived from that Member State.  Brussels Reg. Art. 24. Neither of those circumstances are implicated here.

Finally, I reject Plaintiffs' argument that denying them a Delaware forum to litigate this dispute would somehow violate positive law or Delaware's public policy. As noted, Plaintiffs have invoked Section 168(a) as the justification for their request for "an order requiring Allomet to issue new uncertified shares or a new certificate of stock in the name of AHMR."[97] They argue that only a Delaware court should interpret and enforce this provision of the DGCL.[98] Even if that were true, Section 168(a) does not fit here. *First*, Section 168 provides for the replacement of a lost, stolen, or destroyed stock certificate for the beneficial owner of the stock. It is not and never was intended to address disputes regarding stock ownership, the resolution of which would require the issuance of new stock, not replacement stock.[99] But that is precisely what Plaintiffs seek here. No stock has been lost, stolen or destroyed. Defendants have simply elected not to issue stock to AHMR because they maintain they are not obliged to do so. Section 168(a), by its terms, has no role

---

[97] Compl. ¶ 85.

[98] PAB at 29 ("Absent such express statutory authorization, however, the mandatory provisions of the DGCL, like section 168, control and this Court cannot be divested of jurisdiction.").

[99] *See* 8 *Del. C.* § 168(a) ("If a corporation refuses to issue new uncertificated shares or a new certificate of stock *in a place of a certificate theretofore issued by it* . . .") (emphasis supplied); *In re Metro. Royalty Corp.*, 62 A.2d 857, 858 (Del. Super. Ct. 1948) (explaining that under Section 168, "[t]he burden is upon the petitioner to establish with reasonable certainty that the certificates *were owned by him* and that they had become *lost or destroyed*.") (emphasis supplied).

to play in that dispute. *Second*, the aspect of the parties' dispute where Plaintiffs seek to invoke Section 168(a) involves a disagreement regarding the ownership and transfer of shares under an agreement (i.e., the dispute among AHMR and Fobio under either the R&L Agreement or the SPA contemplated by the R&L Agreement). That is a dispute grounded in contract, not the DGCL.[100]

Plaintiffs' other attempt to avoid Section 9 by invoking the DGCL fares no better. Relying on 8 *Del. C.* Section 115, Plaintiffs incorrectly contend that the R&L Agreement's forum selection clause cannot apply to their Section 168 claim because "the mandatory provisions of the DGCL, like [S]ection 168, control and this Court cannot be divested of jurisdiction."[101] Section 115 places limitations on the scope of forum selection provisions that Delaware corporations may place in their governing documents; it does not reach other contracts between the corporation's constituents.[102] Stockholders can expressly waive Delaware venue in a contract

---

[100] *See Ohrstrom v. Harris Tr. Co. of N.Y.*, 1998 WL 13859, at \*2 (Del. Ch. Jan. 9, 1998) (holding a claim did not fall under Section 168 when plaintiffs did not allege the disputed shares were ever issued to them or that they ever held certificates for them).

[101] PAB at 29.

[102] *See* 8 *Del. C.* § 115 ("[N]o provision of the certificate of incorporation or the bylaws may prohibit bringing [a claim as to which the DGCL confers jurisdiction on the Court of Chancery] in the courts of [Delaware].")*. Bonanno*, 2016 WL 614412, at \*15 ("[Section 115] does not purport to impose this same restriction on forum selection provisions located outside those two governing documents.").

24

between stockholders and the corporation.[103]  This is precisely what the parties did here and their election to do so faces no barrier in Delaware law.

## B. This Action is Dismissed Without Prejudice

"Under Court of Chancery Rule 12(b)(3), a court will grant a motion to dismiss based upon a forum selection clause where the parties 'use express language clearly indicating that the forum selection clause excludes all other courts before which those parties could otherwise properly bring an action.'"[104]  Austrian law will govern the interpretation of the R&L Agreement.  The construction and application of the R&L Agreement and related agreements will inform whether the contemplated joint venture was consummated and, if so, what rights the parties possess under the operative agreements.  Thus, this action will be dismissed without prejudice in favor of the parties' chosen forum—Vienna, Austria.

To date, neither party has filed an action in that forum, so we do not yet know how the court there will proceed.  Accordingly, the dismissal is without prejudice in recognition that this court likely does have jurisdiction and likely would be an appropriate forum but for the forum selection clause.  Should the courts in Vienna

---

[103] *See Bonanno*, 2016 WL 614412, at *15.

[104] *Ashall Homes*, 992 A.2d at 1245 (citing *Eisenbud v. Omnitech Corp. Sols., Inc.*, 1996 WL 162245, at *1 (Del. Ch. Mar. 21, 1996)).

25

decline to hear this case, either party may refile here without regard for the forum selection clause.

## C. The Status Quo Order Is Vacated

The existing status quo order must be vacated. In deciding whether to modify or vacate a status quo order, it is proper for the court to assess whether the facts or circumstances justifying the initial restraint have changed.[105] This includes whether there is a basis to reconsider the court's initial determination that the plaintiff demonstrated either a colorable claim (for a temporary restraining order) or likelihood of success on the merits (for a preliminary injunction).[106]

I have determined Plaintiffs ignored a controlling forum selection clause to bring this action in the wrong court and that the action, therefore, must be dismissed. The court that will hear this claim should be the court to determine what, if any, preliminary measures are appropriate to restrain Defendants' conduct. Moreover, even if I were inclined to keep a status quo order in place in a case I have determined should be dismissed, I would be hard pressed to conclude that Plaintiffs have demonstrated the kind of continued irreparable harm that would justify doing so.[107]

---

[105] *United Bhd. of Carpenters Pension Plan v. Fellner*, 2014 WL 1813280, at *1 (Del. Ch. May 1, 2014).

[106] *Id.* at *2.

[107] *See Raptor Sys., Inc. v. Shepard*, 1994 WL 512526, at *2 (Del. Ch. Sept. 12, 1994) (holding irreparable harm is a necessary element of a status quo order).

Plaintiffs maintain that injunctive relief is required to prevent Defendants from "erod[ing] Plaintiffs' *ex ante* position as Allomet's largest creditors."[108] But that is not a circumstance that compels equity's intervention.[109]

As for Plaintiffs' argument that they need the status quo order to restrict Allomet's incoming capital because the R&L Agreement's "purpose was to regulate the funding of the Allomet Corporation until the establishment, under Austrian law, of a holding company," that argument fails for two reasons.[110] *First*, the R&L Agreement and the Supplementary Agreement have now expired by their terms.[111] *Second*, there is no agreement among the parties expressly defining Allomet's rights or obligation with regard to financing. Even under Plaintiffs' narrative, it cannot be ignored that Allomet is governed by a board of directors and AHMR could not affect the composition of that board without the consent of both of its 50% blocs. At the moment, there is no showing that this deadlocked Austrian company would have any ability to regulate Allomet's financing.

---

[108] PAB at 14. For what it is worth, it appears that Fobio is, in fact, Allomet's largest creditor. Allomet owes Fobio more than $42 million; it owes Plaintiffs $3.6 million.

[109] *See E.I. Du Pont de Nemours and Co. v. HEM Research, Inc.*, 576 A.2d 635, 639 (Del. Ch. 1989) (rejecting injunction in part because "its sole function and effect would be to freeze [Defendants'] assets in place to make them available to satisfy any money judgment that [Plaintiffs] would obtain if it were to prevail.").

[110] Compl. ¶ 23.

[111] Exs. B & G.

Given the fact that circumstances do not justify the maintenance of the status quo order entered by the Court, that order must be vacated. Plaintiffs are free, of course, to seek similar relief from the courts in Vienna as justified by Austrian law.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' Verified Complaint under Court of Chancery Rule 12(b)(3) is **GRANTED.** The Complaint is dismissed without prejudice. The status quo order entered by the Court on October 11, 2018 is **VACATED**.

**IT IS SO ORDERED.**