**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| PARTNERS & SIMONS, INC. and HY CONNECT, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0776-MTZ |
| SANDBOX ACQUISITIONS, LLC, SANDBOX ADVERTISING, INC., ALARIS ROYALTY CORP., NOVO ADVISORS, LLC AND CURTIS KRAWETZ, | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS
PURSUANT TO COURT OF CHANCERY RULE 12(B)(2)**

**WHEREAS**, upon consideration of the Motions to Dismiss pursuant to Court of Chancery Rule 12(b)(2), filed on December 2, 2020 (the "Motions") by Defendants Novo Advisors, LLC ("Novo") and Curtis Krawetz,[1] as well as any oppositions thereto, it appears as follows:[2]

---

[1] Docket Item ("D.I.") 22; D.I. 25.

[2] I draw the following facts from the Verified Complaint, available at D.I. 1 [hereinafter "Compl."], as well as the documents attached to and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014).

1

A.     Plaintiffs Partners & Simons, Inc. and HY Connect, Inc. (collectively, "Buyers" or "Plaintiffs")[3] bring claims for fraud and breach of contract against Sandbox Advertising Inc. ("Advertising"), Sandbox Acquisitions, LLC ("Acquisitions"), Alaris Royalty Corp. ("Alaris," and collectively with Acquisitions and Advertising, the "Sellers," and each a "Seller"), Novo, and Krawetz (together with Sellers, "Defendants").

B.     Sellers are former equity holders of a group of affiliated entities that comprised the advertising agency known as Sandbox ("Sandbox" or the "Company").[4]   Buyer alleges Sellers exercised their leverage and influence over Sandbox to knowingly perpetrate an accounting fraud, with assistance from their advisors, in connection with Buyer's purchase of all equity interests in Sandbox for $60 million (the "Transaction"), pursuant to an Equity Purchase Agreement (the "EPA") dated February 28, 2020 (the "Closing").[5]

C.     Sellers are non-Delaware entities.  Acquisitions is a Nevada limited liability company with its principal place of business in Chicago, Illinois. Advertising is a Canadian corporation with its principal place of business in Calgary,

---

[3] Partners & Simons, Inc. is a Delaware corporation with its principal place of business in Boston, Massachusetts.  HY Connect, Inc. is a Delaware corporation with its principal place of business in Chicago, Illinois.

[4] Those affiliated entities included Underline Communications, LLC; UNISON Resource Company, LLC; Goble & Associates, LLC; and Sandbox Advertising LP.

[5] Compl. Ex. A [hereinafter "EPA"].

2

Alberta. And Alaris is also a Canadian corporation with its principal place of business in Calgary, Alberta. Krawetz is an individual domiciled in Canada, and Novo is a Colorado limited liability company with its principal place of business in Chicago, Illinois.

D. In fall 2019, Buyers and Sellers began discussing Buyers' potential acquisition of Sandbox. Once that process was underway, Alaris, acting as Sandbox's controlling stockholder, exercised its contractual right to remove the Company's then-existing managers and board members and appointed Krawetz, Alaris's V.P. of Investments and Investor Relations, as the Company's sole manager and sole board member. In that role, Krawetz orchestrated a massive accounting fraud to artificially inflate the Company's value and the purchase price to benefit Alaris.

E. In the period between December 19 and Closing, with Krawetz controlling Sandbox as its sole manager and board member, Sellers cooked Sandbox's books to inflate its valuation and the ultimate purchase price in the Transaction. At Alaris's behest, the Company appointed Novo as a financial advisor to monitor Sandbox's business and act as Alaris's "eyes and ears" throughout the sales process.[6] Novo provided financial and accounting services as Sandbox was preparing for sale; assisted Sandbox in managing its cash and vendor relationships;

---

[6] Compl. ¶ 24(b).

assisted Sandbox in forecasting its cash position and illustrating its need for additional financing from Alaris; and assisted in reviewing finance and accounting information provided by Sandbox's finance and accounting team before it was presented to Alaris and other stakeholders.[7]  As alleged, in performing those tasks, Novo assisted Sellers and Krawetz in perpetrating a Company-wide accounting fraud and concealing it from Buyers.  Everyone involved in this scheme, including Novo and the lower-level Sandbox employees tasked with carrying it out, were aware that Sandbox's practices were inaccurate and not in compliance with GAAP accounting standards.

F.     Krawetz and Sellers actively directed the omission, misrepresentation, and misstatement of material facts (including by Novo) to Buyers.  Krawetz controlled the flow of information to Buyers by controlling Novo, as well as Sandbox's CEO and another advisor.

G.     Buyers began questioning the information provided to them and the accuracy of Sellers' representations and warranties in initial drafts of the EPA. Although Krawetz knew those representations and warranties were false, he responded to Buyers' concerns by agreeing to additional representations and warranties.  Krawetz knew those additions were false and misleading, but agreed to

---

[7] D.I. 22 ¶ 12, Affidavit of Sandeep Gupta in Support of Novo's Motion to Dismiss [hereinafter "Gupta Aff."].

4

them anyway in order to induce Buyers to proceed to Closing at the inflated purchase price.

H. As a result of the fraud, Sellers knowingly made false and misleading representations and warranties in the EPA. Buyers relied on these representations and warranties, and proceeded to Closing, purchasing Sandbox for $60 million, subject to post-Closing adjustments. Because of the "pervasive and widespread" accounting fraud that "Sellers went to great lengths to conceal,"[8] Buyers overpaid by approximately $37.2 million.

I. Krawetz executed the EPA in his capacity as Acquisitions's Manager.[9] Novo was not a party to the EPA and is not mentioned in it.[10]

J. Section 8.18 of the EPA included a forum selection clause in favor of Delaware:

---

[8] Compl. ¶ 12.

[9] *See* EPA, Signature Pages.

[10] *See generally id.*

5

Each party hereby irrevocably submits to the exclusive jurisdiction of the state or federal courts located in the state of Delaware, in respect of any claim relating to the interpretation and enforcement of the provisions of this Agreement and of the documents referred to in this Agreement, or otherwise in respect of the transactions contemplated hereby and thereby, and hereby waives, and agrees not to assert, as a defense in any action, suit or proceeding in which any such claim is made that it is not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in such courts or that the venue thereof may not be appropriate or that this Agreement or any such document may not be enforced in or by such courts.[11]

K.     After Closing, Buyers discovered the fraud and attempted to invoke the EPA's dispute resolution procedures.  When those efforts proved fruitless, Buyers filed the Complaint in this action on September 11, 2020.  Count I asserts fraud by Sellers.  Count II asserts fraudulent conspiracy by Novo and Krawetz.  Count III seeks indemnification from Sellers relating to their breaches of the EPA's representations and warranties.  And Count IV asserts a breach of contract claim against Sellers relating to the EPA's dispute resolution process.

L.     On December 2, Novo and Krawetz filed the Motions to dismiss all claims against them pursuant to Court of Chancery Rule 12(b)(2) for lack of personal jurisdiction.[12]  That same day, Acquisitions, Alaris, and Krawetz moved to dismiss Counts I, II, and IV pursuant to Court of Chancery Rule 12(b)(6).[13]  The parties

---

[11] *Id.* § 8.14.

[12] D.I. 22; D.I. 25.

[13] D.I. 23; D.I. 24.

6

briefed the Motions as of March 12, 2021.[14] I held argument on April 23, and took the Motions under advisement.[15]

M. "Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant."[16] But "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[17] "In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record."[18] If the Court has not held an evidentiary hearing, "plaintiffs need only make a *prima facie* showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff."[19]

N. Determining "whether a Delaware court has jurisdiction over a nonresident defendant" involves "a two-step analysis."[20] Initially, the court must determine whether a statutory basis exists for the exercise of jurisdiction, such as

---

[14] DI. 56; D.I. 57; D.I. 58; D.I. 67; D.I. 68.

[15] D.I. 76; D.I. 77.

[16] *Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 800–02 (Del. Ch. 2020) (quoting *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sept. 12, 1996)).

[17] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[18] *Id.*

[19] *Id.* (footnote and internal quotation marks omitted) (quoting *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003)).

[20] *E,g.*, *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

Delaware's long arm statute.[21]  "If so, the court must decide whether subjecting the nonresident defendant to jurisdiction would violate due process."[22]  For the assertion of jurisdiction to pass constitutional muster, "a nonresident defendant must have sufficient minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."[23]

O.  "A defendant can consent to a court's exercise of personal jurisdiction," as personal jurisdiction is a "waivable right."[24]  "Consent to personal jurisdiction is often express, but it can also be implied.  The majority rule holds that when parties agree to litigate in a particular forum, they consent implicitly to the existence of personal jurisdiction in that forum."[25]  "One such arrangement is a forum-selection clause in a contract."[26]  "Where the parties to the forum selection clause have consented freely and knowingly to the court's exercise of jurisdiction, the clause is sufficient to confer personal jurisdiction on a court."[27]  "When a party is bound by a

---

[21] *See id.* (citing 10 *Del. C.* § 3104).

[22] *Id.*

[23] *Id.* (alteration and internal quotation marks omitted) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[24] *Holsopple*, 241 A.3d at 801 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985)).

[25] *Id.* at 802 (alterations omitted) (quoting *In re Pilgrim's Pride Corp. Deriv. Litig.*, 2019 WL 1224556, at *11 (Del. Ch. Mar. 15, 2019) (collecting cases)).

[26] *Id.*

[27] *Pilgrim's Pride*, 2019 WL 1224556, at *10 (quoting *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013)).

forum selection clause, the party is considered to have expressly consented to personal jurisdiction. An express consent to jurisdiction, in and of itself, satisfies the requirements of Due Process, eliminating the need to undertake a minimum contacts analysis."[28]

P. Plaintiffs contend Krawetz and Novo consented to personal jurisdiction in Delaware via the EPA's forum selection clause. Krawetz is not a signatory to the EPA in his personal capacity, and Novo is not a signatory to the EPA at all. To determine whether a non-signatory is bound by a forum selection clause, the Court asks three questions, each of which must be answered in the affirmative: "First, is the forum selection clause valid? Second, are the defendants third-party beneficiaries, or closely related to, the contract? Third, does the claim arise from their standing relating to agreement?"[29]

Q. In this case, the first and third questions are undisputedly answered affirmatively. The issue is whether Novo and Krawetz are closely related to the EPA; Plaintiffs do not argue that they are third-party beneficiaries. "The cases suggest two ways a party can be closely related to an agreement: 1) she receives a

---

[28] *Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *3 (Del. Ch. Sept. 18, 2019) (footnote and internal quotation marks omitted) (quoting *Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp. 2d 452, 456 (D. Del. 2008)); *see also Pilgrim's Pride*, 2019 WL 1224556, at *14 ("[W]hen a party agrees to a forum-selection provision, the circumstances may imply that the party has consented to jurisdiction.").

[29] *Neurvana*, 2019 WL 4464268, at *3 (alteration omitted) (quoting *Cap. Gp. Cos. v. Armour*, 2004 WL 2521295, at *5 (Del. Ch. Oct. 29, 2004)).

direct benefit from the agreement; or 2) it was foreseeable that she would be bound by the agreement."[30]

R.      "In evaluating whether a non-signatory received a direct benefit for the purpose of the closely-related test, Delaware courts have deemed both pecuniary and non-pecuniary benefits sufficient to satisfy the test.  By contrast, indirect benefits have been deemed insufficient to satisfy the test."[31]  "This Court's case law on this point is clear:  to be bound by forum selection clauses, non-signatories must actually receive a benefit under or by way of the contract."[32]

S.      "The foreseeability inquiry rests on the public policy that forum selection clauses promote stable and dependable public relations, and it would be inconsistent with that policy to allow the entities through which one of the parties chooses to act to escape the forum selection clause."[33]  It "seeks to foreclose an end-run around an otherwise enforceable forum selection provision."[34]  "On this basis, cases have applied the foreseeability inquiry to bind a range of transaction

---

[30] *Weygandt v. Weco, LLC*, 2009 WL 1351808, at *4 (Del. Ch. May 14, 2009) (footnote omitted); *accord Neurvana*, 2019 WL 4464268, at *3 ("[T]he operative question is whether [the non-signatory] is a third-party beneficiary or closely related to the [agreement].").

[31] *Neurvana*, 2019 WL 4464268, at *4 (footnote omitted).

[32] *Sustainability P'rs LLC v. Jacobs*, 2020 WL 3119034, at *6 (Del. Ch. June 11, 2020).

[33] *Neurvana*, 2019 WL 4464268, at *5 (internal quotation marks omitted) (quoting *Weygandt*, 2009 WL 1351808, at *5).

[34] *Id.* (alterations omitted) (quoting *Ashall Homes Ltd. v. ROK Ent. Gp. Inc.*, 992 A.2d 1239, 1248 (Del. Ch. 2010) (applying a version of the foreseeability inquiry to foreclose an "end run" around an enforceable forum selection provision)).

participants who did not sign the relevant agreement."[35]  Delaware courts have applied this concept in the controller context, where the signatory controls the non-signatory involved in the transaction.[36]  This Court has purposefully "limited the scope of the foreseeability inquiry to controlled non-signatories—those entities that the signatories to the agreement could manipulate in an 'end-run' around the forum selection provision," and "has further explained that the test should not extend to all non-signatories that a signatory happens to control."[37]  "[T]he non-signatory must bear a clear and significant connection to the subject matter of the agreement."[38]  Importantly, this Court has cautioned that the foreseeability test should be applied "narrowly," as "[i]t typically requires rejecting principles of corporate separateness."[39]

**IT IS HEREBY ORDERED**, this 26th day of July, 2021:

1.      The Complaint acknowledges that Novo and Krawetz are not domiciled in Delaware, but does not contain any allegations specifically identifying the basis

---

[35] *Id.* (internal quotation marks omitted) (quoting *Weygandt*, 2009 WL 1351808, at *5 n.26).

[36] *See Weygandt*, 2009 WL 1351808, at *5.

[37] *Neurvana*, 2019 WL 4464268, at *6 (quoting *Ashall*, 992 A.2d at 1248, and then quoting *iModules Software, Inc. v. Essenza Software, Inc.*, 2017 WL 6596880, at *3 (Del. Ch. Dec. 22, 2017)).

[38] *Id.* (internal quotation marks omitted) (quoting *iModules*, 2017 WL 6596880, at *3).

[39] *Id.* (collecting cases).

for this Court's personal jurisdiction over those defendants.[40] Instead, Plaintiffs attempt to stretch this Court's jurisdiction to reach those defendants by arguing that the Complaint's allegations against Novo and Krawetz make out a *prima facie* case that they are bound by the EPA's forum selection clause under the closely related test. Applying the above principles, I conclude the EPA's forum selection clause does not confer personal jurisdiction over Novo or Krawetz.

2. The Motion is **GRANTED** as to Novo.

a. First, Plaintiffs have failed to demonstrate that Novo received a direct benefit under the EPA. Plaintiffs point out that Novo charged $600,000 for advising throughout the sales process and that it received half of those fees only when the Transaction closed. But these fees are not sufficiently related to the EPA to bind Novo to its forum selection clause. Novo may have benefitted from the sales process and the Closing, but Plaintiffs allege no facts indicating that Novo directly benefitted under the EPA. Nor have Plaintiffs alleged that the EPA's terms were conditioned on the delivery of a benefit to Novo. Novo's advisory fees on the sales process and Closing are too attenuated from the EPA to give rise to personal jurisdiction via the forum selection clause.[41] Novo's alleged benefits are "indirect,"

---

[40] *See generally* Compl.

[41] *Cf. McWane, Inc. v. Lanier*, 2015 WL 399582, at *7 (Del. Ch. Jan. 30, 2015) (finding that the individual defendants received a direct benefit when their stock was sold as governed by that agreement, and the amount they received was "not [an] insignificant fraction of the total initial purchase price"); *Cap. Gp.*, 2004 WL 2521295, at *7 (finding

12

merely contemplated in the course of carrying out the Transaction, and are therefore insufficient to bind Novo, a non-signatory, to the EPA's forum selection clause.[42]

b. Plaintiffs next argue that it was foreseeable for Novo to be bound by the forum selection clause because Alaris used Novo as an instrument to perpetuate the fraud, "figur[ing] prominently in the transaction by offering key financial and accounting guidance to Alaris while also acting as a gatekeeper in connection with the diligence process."[43] This Court has limited foreseeability to "when a controlled entity [*e.g.*, an affiliate or subsidiary] is subject to a forum selection clause agreed to by its controller [*e.g.*, the parent] and the controlled entity bears a 'clear and significant connection to the subject matter of the agreement.'"[44] In applying the foreseeability test to advisors, this Court has rejected federal cases finding personal jurisdiction over defendants that were actively "involved in the planning and negotiation of the agreement to such a degree that it could expect to be

---

that, in a stock-restriction agreement between a company and its employee, the employee's non-signatory wife received a direct benefit and was bound by the forum clause because the company allowed the employee to transfer his individually-titled stock to a joint trust for himself and his wife on the condition that the employee execute the stock-restriction agreement).

[42] *Neurvana*, 2019 WL 4464268, at *4.

[43] D.I. 57 at 14.

[44] *Sustainability P'rs*, 2020 WL 3119034, at *7 (quoting *iModules*, 2017 WL 6596880, at *3).

bound by the agreement,"[45] because "[b]y divorcing the foreseeability inquiry from circumstances in which the signatory controls the non-signatory, [the federal court] takes the inquiry a step too far."[46]

        c.      While Novo allegedly participated in the fraud at Krawetz's direction, Novo remained Sandbox's unaffiliated financial advisor. Plaintiffs have not alleged that Novo is an affiliate of or controlled by any party to the EPA. Novo, as Sandbox's financial advisor, does not invoke the policy that supports reaching controlled entities that could otherwise "manipulate in an 'end-run' around the forum selection provision"[47] and "allow the entities through which one of the parties chooses to act to escape the forum selection clause."[48] Novo's duties were cabined to overseeing the Company's financials and responding to due diligence—in essence, preparing and distilling the information Sellers provided, which ultimately supported or belied Sellers' representations and warranties. Plaintiff does not allege that Sellers made those representations and warranties through Novo, nor that Novo has affirmatively invoked any provision of the EPA. Delaware's narrow

---

[45] *Neurvana*, 2019 WL 4464268 at *7 (quoting *Ninespot, Inc. v. Jupai Hldgs. Ltd.*, 2018 WL 3626325, at *5 (D. Del. July 30, 2018)).

[46] *Id.* at *8.

[47] *Id.* at *6 (quoting *Ashall*, 992 A.2d at 1248).

[48] *Id.* at *5 (quoting *Weygandt*, 2009 WL 1351808, at *5).

14

foreseeability test does not stretch the EPA's forum selection clause to reach Novo as Sandbox's third-party advisor.

3. The Motion is **GRANTED** as to Krawetz.

a. Plaintiffs first suggest that Krawetz is bound by the EPA's forum selection clause because of "the direct benefit Krawetz received in his role as sole manager and board member of the Company in closing the transaction."[49] Plaintiffs do not elaborate on the alleged direct benefit that Krawetz received, and merely conclude without support that Krawetz "stood to reap a direct benefit from inducing Plaintiffs' execution of the EPA" in view of "his role as the sole manager and board member of the Company."[50] The Complaint alleges that Alaris appointed Krawetz to those positions via an independent contractual right before the EPA's terms were finalized. Alaris may have appointed Krawetz to facilitate the Transaction, but those positions preceded the EPA, did not flow from it, and do not constitute a direct benefit under it.[51] And while Plaintiffs argue that Krawetz stood to benefit from inducing Buyers to execute the EPA, the Complaint alleges Krawetz sought a payout for Alaris as the Company's preferred equityholder, not any personal benefit.

---

[49] D.I. 58 at 1.

[50] *Id.* at 18.

[51] *See Baker v. Impact Hldg., Inc.*, 2010 WL 1931032, at *4 (Del. Ch. May 13, 2010) (concluding that the defendant received a direct benefit because the relevant agreement expressly named him as a director).

15

Plaintiffs fail to make a *prima facie* case that Krawetz received any direct benefit under the EPA.

b. Acknowledging that any direct benefit to Krawetz is a thin reed,[52] Plaintiffs next argue it was foreseeable that Krawetz would be bound by the EPA's forum selection clause, as he was actively involved in the sales process as an Alaris affiliate and Acquisitions's manager, both of which are signatories to the EPA. As alleged, Krawetz controlled and directed the Company during the sales process; he was responsible for preparing the Company for sale and securing the most favorable purchase price for Alaris's benefit, including by perpetuating the accounting fraud, concealing the Company's accurate financials from Buyers, and committing Sellers to knowingly false representations and warranties.

c. But Plaintiffs' theory that Krawetz controlled Sandbox does not satisfy the foreseeability test. The scope of the foreseeability inquiry, in the absence of a direct benefit and as applied to defendants, is limited to a circumstance in which the signatory controlled the defendant non-signatory.[53] Plaintiffs ask the Court to

---

[52] *See* D.I. 58 at 10 (noting that the second element of the "closely related" test requires a showing of direct benefit from the agreement or foreseeability that the non-signatory would be bound, and thereafter meaningfully addressing only the foreseeability issue).

[53] *See Neurvana*, 2019 WL 4464268, at *5 ("Delaware courts have applied this concept in the controller context, where the signatory controls the non-signatory involved in the transaction.") (citing *Weygandt*, 2009 WL 1351808, at *5)); *id.* at *6 (elaborating on the control theory of foreseeability); *iModules*, 2017 WL 6596880, at *3–4 (articulating the foreseeability inquiry to require that the signatory control the non-signatory, and limiting

16

expand that test to the converse circumstance, in which the non-signatory controls the signatory. They ask the Court to find it was foreseeable that Krawetz would be bound because he controlled Acquisitions. But this expansion is discouraged by and inconsistent with Delaware law.[54]

> d.  The control theory of foreseeability is intentionally "narrow[]" because it sets aside principles of corporate separateness and introduces uncertainty into carefully structured transactions.[55] "To ensure a workable closely-related test, Delaware courts are wise to exercise caution in extending the foreseeability inquiry beyond the facts of" a controlled non-signatory.[56] Where the facts at bar have not aligned with previous discrete applications of the standalone foreseeability inquiry, this Court has declined to expand the test.[57]

---

the scope of the foreseeability inquiry to controlled non-signatories that could end-run the forum selection provision).

More specifically, "this Court has applied the foreseeability inquiry as a standalone basis for satisfying the closely-related test in two scenarios." *Neurvana*, 2019 WL 4464268, at *5. As stated, one of those scenarios occurs where the signatory controls the non-signatory. The other, which is inapplicable here, occurs where "[t]he plaintiffs used the defendants' non-signatory status offensively to argue that the defendants had no standing to enforce the forum selection provision." *Id.* (citing *Ashall*, 992 A.2d at 1249, and *Lexington Servs. Ltd. v. U.S. Pat. No. 8019807 Delegate, LLC*, 2018 WL 5310261, at *5 (Del. Ch. Oct. 26, 2018)).

[54] *See Neurvana*, 2019 WL 4464268, at *5–6; *Sustainability P'rs*, 2020 WL 3119034, at *7.

[55] *Neurvana*, 2019 WL 4464268, at *6 (describing the *iModules'* iteration of the control theory of foreseeability as "narrow[]").

[56] *Id.*

[57] *See Neurvana*, 2019 WL 4464268, at *7; *Sustainability P'rs*, 2020 WL 3119034, at *7.

e.    Plaintiffs rely on a federal case to support jurisdiction over Krawetz: *Carlyle Investment Managment LLC v. Moonmouth Co. SA*.[58]  There, the Third Circuit held that a non-signatory entity was bound by a forum selection clause under the closely related test.[59]  The non-signatory was a director that executed the relevant agreement on the company's behalf, and both the non-signatory and the

---

[58] 779 F.3d 214 (3d Cir. 2015).

[59] In reaching this conclusion, the *Carlyle* court concluded that "[t]his result is consistent with Delaware cases in which affiliates, officers, and directors have been held to be bound by forum selection clauses."  *Id.* at 219 (citing *Baker*, 2010 WL 1931032, at *4, and *Weygandt*, 2009 WL 1351808, at *5).  I respectfully believe that decision strains *Baker* and *Weygandt*.  In *Weygandt*, the Court concluded that it was foreseeable that the controlled company of the individual that negotiated and benefitted from a transaction would become involved in a dispute under the transaction agreement and that therefore it was subject to its forum selection clause.  *Weygandt*, 2009 WL 1351808, at *5 ("Weygandt negotiated the entire Repair Business transaction, including the sale of the Business and the lease of the Lincoln Facility.  Weygandt agreed, on behalf of both himself and Weco-California, to a forum for resolving disputes arising from the sale of the Repair Business.  Both Weygandt and Gulfstream expected that if there was a dispute regarding the Asset Purchase Agreement, it would be resolved in Delaware-indeed, Weygandt and Weco-California initiated this very suit in this court.  Likewise, it should have been apparent to Weygandt, and therefore his controlled company, W & A, that W & A might become involved in a dispute under the Asset Purchase Agreement.").  And in *Baker*, the Court concluded the director who executed an agreement on the company's behalf would be subject to its forum selection clause under the direct benefit test, as that director stood to receive a board seat under the agreement.  *Baker*, 2010 WL 1931032, at *4 ("Holding argues that the seat on the board of directors Baker received via the SHA constitutes a direct benefit to him.  Baker disputes this, claiming that the board seat did not provide him with a pecuniary benefit, and, therefore, it cannot be considered a direct benefit.  Contrary to Baker's assertion, however, a benefit need not be pecuniary to constitute a direct benefit.  Further, I find a right to a seat on the board of directors of Holding, a company in which Impact Investments, of which Baker is a manager, has a substantial investment, is sufficient to constitute a direct benefit to Baker.  Thus, I find that because the SHA expressly names him as a director of Holding, Baker received a direct benefit from the SHA." (footnotes omitted)).

company were owned and controlled by the same individual. In addition, the non-signatory participated in the agreement's negotiations, and the agreement identified the non-signatory as the "source of funds" for the subject investment.[60]

f.       But *Carlyle* is still an example of binding a non-signatory under the signatory's control umbrella, which is directionally consistent with the narrow foreseeability test. Here, Krawetz is not controlled by Acquisitions or a common controller. Further, the Complaint lacks similar allegations of funding by the non-signatory that would strengthen any connection to the agreement. The similarities to *Carlyle*—that the non-signatory executed the agreement and participated in its negotiation—are insufficient to satisfy Delaware's narrow foreseeability test.

g.       More generally, expanding the foreseeability test to reach Krawetz as the human decisionmaker for the signatory entity would clash with and erode the general rule that individuals who sign agreements on behalf of the corporate entities they represent are not personally bound by forum selection clauses in those agreements.[61] Like the distinction between corporate entities, the distinction between entities and their human decisionmakers is a meaningful one that should not easily fall to the closely related test; this Court and others have acknowledged

---

[60] *Carlyle*, 779 F.3d at 219.

[61] *E.g.*, *Baker*, 2010 WL 1931032, at *3 ("As is well established under Delaware law, signing an agreement in a representative capacity does not bind the signer in his personal capacity.").

the potential pitfalls of ignoring such distinctions.[62]  And fraud allegations aside, Krawetz was the Company's duly appointed manager; unlike control over a non-signatory actor that might facilitate a problematic end-run around a forum selection clause, Krawetz's control over Acquisitions is no artifice of transactional planning.

> h.  Having fallen afield of the foreseeability test's narrow control requirements, Krawetz's active involvement in negotiating the EPA cannot satisfy that test.[63]  Although federal courts have stretched the foreseeability inquiry to reach those actively involved in negotiating an agreement, then-Vice Chancellor McCormick expressly rejected those decisions as inconsistent with this Court's

---

[62] *See Neurvana*, 2019 WL 4464268, at *6 ("The Court in *iModules* was correct to articulate the foreseeability analysis narrowly.  Though striving to promote stable and dependable public relations, in many respects, the foreseeability inquiry does the opposite. It typically requires rejecting principles of corporate separateness.  Rejecting corporate separateness in turn results in uncertainty for transaction participants, including participants who go to great lengths to avoid being haled into a Delaware court" in structuring the transaction.  Given this aspect of the closely-related test, one court has described the test as so vague as to be unworkable.  To ensure a workable closely-related test, Delaware courts are wise to exercise caution in extending the foreseeability inquiry beyond the facts of *Ashall/Lexington* and *iModules*." (alterations, footnotes, and internal quotation marks omitted) (quoting *Ninespot*, 2018 WL 3626325, at *5–6, and citing *Compucom Sys., Inc. v. Getronics Fin. Hldgs. B.V.*, 2012 WL 4963308, at *4 (D. Del. Oct. 16, 2012), and also citing *Dos Santos v. Bell Helicopter Textron, Inc.*, 651 F. Supp. 2d 550, 556 (N.D. Tex. 2009))); *Compucom*, 2012 WL 4963308, at *4 ("The facts of record *no doubt highlight the tension between those principles honoring corporate formalities* and the realities of international business transactions carried out through multiple related entities." (emphasis added)); *Weygandt*, 2009 WL 1351808, at *5 n.25 (then-Vice Chancellor Strine lamenting that "I find the statements of the foreseeability rule to be somewhat circular—a party is bound when she should know she will be bound.  But, the cases applying it seem to focus on whether the same people were involved in all of the agreements, even if they were acting on behalf of different entities.").

[63] *See Neurvana*, 2019 WL 4464268, at *7–8.

approach in *Neurvana Medical, LLC v. Balt USA, LLC*.[64] "[D]ivorcing the foreseeability inquiry from circumstances in which the signatory controls the non-signatory . . . takes the inquiry a step too far," and "there are good reasons for narrowly construing the foreseeability inquiry to conform to the scenarios in which this Court has previously invoked it."[65]

          i.       Krawetz signed the EPA as Acquisitions's Manager. As alleged, he wielded that role and his control over Sandbox employees and advisors to perpetuate the fraud and cause Sellers to agree to knowingly false representations and warranties. But those facts do not introduce independent Delaware contacts, and Krawetz's positions as Acquisition's decisionmaker, Sandbox's controller, and Alaris's champion do not bring him within the narrow foreseeability test because he

---

[64] *Id.* at *7–8 ("It was only after finding a direct benefit sufficient to deem the non-signatory closely related that *Compucom* and *Ninespot* undertook an alternative foreseeability analysis, which introduced the "active involvement" theory Plaintiff invokes in this case. In *Compucom*, the court held that the parent entity's active involvement in negotiating and executing the transaction satisfied the foreseeability inquiry of the closely-related test. In *Ninespot*, the court seized upon *Compucom*'s active-involvement theory, finding a non-signatory closely related to an agreement because it was involved in the planning and negotiation of the agreement to such a degree that it could expect to be bound by the agreement. Unlike in *Compucom*, the non-signatory in *Ninespot* was not controlled by signatory. . . . This decision thus declines to apply the active-involvement theory as a standalone basis for satisfying the closely-related test." (alterations, footnotes, and internal quotation marks omitted) (citing *Compucom*, 2012 WL 4963308, at *4, and quoting *Ninespot*, 2018 WL 3626325, at *5)).

[65] *Id.* at *8.

is a controlling non-signatory, not a controlled one. Plaintiffs' allegations do not support personal jurisdiction over Krawetz.

4. Finally, Plaintiffs have requested that the Court permit jurisdictional discovery as to Novo and Krawetz if it determines the Complaint has failed to make a *prima facie* showing of jurisdiction. That request is **DENIED**.

a. "This court may decide a motion to dismiss under Rule 12(b)(2) on the pleadings and affidavits."[66] A plaintiff must set forth a plausible basis for jurisdiction, making a *prima facie* showing. "If the facts alleged in the complaint are insufficient to meet this burden, the trial court *may* permit the plaintiff jurisdictional discovery so long as plaintiff's claim of jurisdiction is not frivolous."[67] "[T]he decision to grant jurisdictional discovery is discretionary."[68] "[T]he Court must determine whether certain discovery avenues, if explored, might provide the 'something more' needed to establish personal jurisdiction. To merit jurisdictional discovery, plaintiffs show that their factual allegations establish with reasonable

---

[66] *E.g.*, *Endowment Rsch. Gp., LLC v. Wildcat Venture P'rs, LLC*, 2021 WL 841049, at *6 (Del. Ch. Mar. 5, 2021).

[67] *Am. Scheduling, Inc. v. Radiant Sys., Inc.*, 2005 WL 736889, at *1 (Del. Ch. Feb. 9, 2005).

[68] *Neurvana Med., LLC v. Balt USA, LLC* (*Neurvana II*), 2019 WL 5092894, at *2 (Del. Ch. Oct. 10, 2019).

particularity the possible existence of requisite contacts."[69]  "[T]here must be at least some indication that this particular defendant is amenable to suit in this forum."[70]  A plaintiff cannot use jurisdictional discovery to simply "fish for a possible basis for this court's jurisdiction."[71]

      b.     Here, Plaintiffs request additional information from Novo related to (1) Novo's involvement in the negotiations of the EPA; (2) Novo's knowledge of specific provisions in the EPA; (3) whether Novo received any additional benefits (beyond the remaining 50% of its fees) in connection with the execution of the EPA; and (4) any retainer or other agreements between Alaris and Novo.[72]  Novo's affidavit submitted in support of its Motion, as well as the documents governing Novo's engagement for the Transaction, undermine the necessity of these requests. Novo was retained by Sandbox in June 2019 to provide financial and accounting services as Sandbox was preparing for a sale.[73]  Novo handled Sandbox's financial information in the form in which Sandbox provided it, and all of Novo's work took

---

[69] *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2020 WL 3564622, at *15 (Del. Ch. June 29, 2020) (footnote and internal quotation marks omitted) (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 454 (3d Cir. 2003)).

[70] *Neurvana II*, 2019 WL 5092894, at *1 (internal quotation marks omitted) (quoting *In re Am. Int'l Gp., Inc.*, 965 A.2d 763, 831 n.195 (Del. Ch. 2009)).

[71] *E.g.*, *Reid v. Siniscalchi, L.L.C.*, 2011 WL 378795, at *4 (Del. Ch. Jan. 31, 2011) (quoting *Am. Int'l Gp.*, 965 A.2d at 816 n.195); *accord Neurvana II*, 2019 WL 5092894, at *1.

[72] *See* D.I. 59, Ex. 7.

[73] Gupta Aff. ¶¶ 10 & 12.

place in Chicago, Illinois.[74] Novo "was not involved with any negotiations relating to either the EPA or any of the EPA's particular terms,"[75] and believed it was not responsible for the accuracy of Sellers' representations and warranties.[76]

      c.    In my view, Plaintiffs' requested discovery will not alter the determination that Novo is not bound by the EPA's forum selection clause. Plaintiffs have failed to allege a nonfrivolous basis for jurisdiction over Novo under the closely related test for the reasons set detailed above.[77] Nor will Plaintiffs' requested discovery overcome Novo's representations under oath, and I do not believe that they would cure Plaintiffs' failure to make a *prima facie* jurisdictional showing. Jurisdictional discovery will not change the documents governing the Transaction nor will it create new contacts sufficient to confer jurisdiction over Novo.[78] The request for jurisdictional discovery as to Novo is therefore denied.

      d.    As to Krawetz, Plaintiffs argue that "given Krawetz's role as sole manager and member, it is highly likely that he received a benefit from signing the

---

[74] *See id.* ¶ 12.

[75] *Id.* ¶ 13.

[76] *See id.* ¶ 9; D.I. 59, Ex. 3 at 2; D.I. 59, Ex. 4 at 1.

[77] *See Neurvana II*, 2019 WL 5092894, at *1.

[78] *See CLP Toxicology*, 2020 WL 3564622, at *16.

24

EPA."[79] Therefore, Plaintiffs primarily request discovery into the compensation Krawetz received, or will receive, in connection with his services performed for the Acquisition; any benefits—whether pecuniary or not—Krawetz received, or will receive, in connection with services performed for the Acquisition; Krawetz's ownership interest in any other Defendant or Sandbox; and communications sufficient to show Krawetz's connection to the EPA.[80] As noted, the Complaint and Plaintiffs' briefing are devoid of "some indication that [Krawetz] is amenable to suit in this forum" under the direct benefit test.[81] Therefore, I conclude that granting discovery would permit Plaintiffs to embark on an undue fishing expedition. The request for jurisdictional discovery is denied as to Krawetz.

5.      Count II is **DISMISSED** pursuant to Rule 12(b)(2).

*/s/ Morgan T. Zurn*
Vice Chancellor Morgan T. Zurn

---

[79] D.I. 58 at 17 (citing *Baker*, 2010 WL 1931032, at *4 (finding that the right to a seat on the board of directors constitutes a direct benefit)).

[80] D.I. 56, Ex. 6.

[81] *Neurvana II*, 2019 WL 5092894, at *1 (internal quotation marks omitted) (quoting *Am. Int'l Gp.*, 965 A.2d at 831 n.195).